Christiane Ziade and Robert Ziade, individually and as parents of Chris Ziade, a stillborn child, appeal from a summary judgment in favor of Mobile Obstetrics Gynecology, P.C. ("MOG"), and Dr. Henry J. Koch and Dr. Robert A. Wood, employees of MOG (collectively referred to as "the defendants"), in the Ziades' wrongful-death action against them based on the intrauterine death of their fetus. We affirm.
 I. Factual Background
According to the undisputed facts, on February 17, 2000, Christiane Ziade, early in her pregnancy, began receiving prenatal care at MOG. On August 28, 2000, she visited Dr. Koch, reporting a "stark decrease in fetal movement." After an examination revealed no cause for alarm, she returned home. She returned to MOG on September 2, 2000, and was examined by Dr. Wood. At that time, a fetal heartbeat was detected.
According to the Ziades' complaint, from September 2, 2000, to September 12, 2000, the date of her next scheduled appointment *Page 1074 
at MOG, Christiane "experienced absolutely no fetal movement." Tests conducted by Dr. Koch on September 12, at approximately 35 weeks of gestation, revealed that the fetus was dead. On September 14, 2000, the fetus was delivered through induced labor.
On September 15, 2000, an autopsy revealed that the fetus had died from a "vascular accident," namely, a "severely torsed umbilical cord at the abdominal surface." The autopsy report listed the "date of death" as September 14, 2000, that is, the date of delivery. The Ziades commenced this action on September 11, 2002, alleging that "[t]he Defendants' acts and omissions caused the wrongful death of Baby Chris Ziade," which, the complaint averred, occurred on September 15, 2000.
The defendants answered the complaint on October 28, 2002. Discovery proceeded in the case, and trial was scheduled for November 14, 2005. The trial court's general pretrial order required each party to furnish the other parties, at least 60 days before trial, the names and addresses of each expert witness expected to testify. The Ziades identified two expert witnesses on whom they intended to rely, namely, Dr. William Greene and Dr. David Schwartz. The defendants deposed those witnesses on September 6, 2005, and September 22, 2005, respectively. However, on September 13, 2005, two days before the 60-day deadline, the Ziades identified a third expert witness, namely, Dr. Frank Battaglia. By an order, the trial court extended the date for identifying expert witnesses to September 19, 2005, and required the Ziades to make all experts available for deposition by September 26, 2005. On that date, the defendants deposed Dr. Battaglia.
On October 4, 2005, the defendants moved for a summary judgment. The motion was based in substantial part on the testimony of the Ziades' experts, who unanimously opined that the fetus had dieat least 48 hours before its death was detected on September 12. In their motion, the defendants asserted — for the first time — that the Ziades' claims were barred by the limitations period in Ala. Code 1975, § 6-2-38(a), which provides: "An action by a representative to recover damages for wrongful act, omission, or negligence causing the death of the decedent under Sections 6-5-391 and 6-5-410 must be commenced within two years from the death."
On October 13, 2005, following the expiration of the period as extended by the trial court for the Ziades to disclose expert witnesses or to present expert testimony, the defendants moved, pursuant to Ala. R. Civ. P. 15(a), to amend their answer to assert the limitations period in § 6-2-38(a). The trial court granted the defendants' motion over the Ziades' opposition. The trial court subsequently entered a summary judgment in favor of the defendants, and the Ziades appealed.
On appeal, the Ziades contend that the trial court erred in allowing the defendants to amend their answer to assert the limitations period of § 6-2-38(a) and, therefore, that the bar presented by the statute of limitations, which was not raised in the answer, has been waived. In any event, they further insist, their claims are not time-barred, because, they say, the limitations period began on September 14, 2000, the date of delivery, regardless of when the death actually occurred. We first address the propriety of the amendment to the defendants' answer.
 II. The Amendment
It is undisputed that the defendants' request to amend their answer was made less than 42 days before the date the case was set for trial, as was the amendment sought in Ex parteLiberty National Life Insurance Co., 858 So.2d 950
(Ala. 2003), *Page 1075 
on which the defendants rely. Particularly applicable here are some principles discussed in that case:
 "Typically, if a party fails to plead an affirmative defense, that defense is deemed to have been waived. Robinson v. Morse, 352 So.2d 1355, 1356
(Ala. 1977) (citing 5 Wright Miller, Federal Practice Procedure § 1278, pp. 339-52); see also Rule 8(c), Ala. R. Civ. P. However, there are exceptions to this rule, one of which is that an affirmative defense can be revived if a party is allowed to amend his pleading to add the defense. Piersol v. ITT Phillips Drill Div., Inc., 445 So.2d 559, 561
(Ala. 1984) (stating that `where no actual prejudice to the opposing party is shown, and no undue delay is demonstrated, a court may permit the amendment of the answer to include a defense of the running of the period of the statute of limitations, though Rule 8(c) of the Alabama Rules of Civil Procedure requires such a defense to be pleaded as an affirmative defense').
 "Rule 15(a), Ala. R. Civ. P., reflects Alabama's liberal policy in favor of allowing amendments to pleadings:
 "`Unless a court has ordered otherwise, a party may amend a pleading without leave of court, but subject to disallowance on the court's own motion or a motion to strike of an adverse party, at any time more than forty-two (42) days before the first setting of the case for trial, and such amendment shall be freely allowed when justice so requires. Thereafter, a party may amend a pleading only by leave of court, and leave shall be given only upon a showing of good cause.
 . . .
 ". . . .
 ". . . However, in light of the over-arching liberal policy of allowing amendments under Rule 15, the appropriate way to view the request for leave to amend, if a party demonstrates `good cause,' is as though the request had been brought more than k.2 days before trial, when the trial court does not have `unbridled discretion' to deny the leave to amend, but can do so only upon the basis of a `valid ground' [such as actual prejudice or undue delay]."
858 So.2d at 953-54 (emphasis and bracketed language added).
The defendants contend that they have demonstrated good cause for amending their answer less than 42 days before the trial date. They point out that the date of death alleged in the complaint was September 15, 2000, and, therefore, that the claims, which were filed on September 11, 2002, were not facially barred. "A plea of limitation of action as to the death claim in the original answer," the defendants argue, "would have beenimproper and unfounded." Defendants' brief, at 40 (emphasis added). According to the defendants, discovery from the Ziades' experts could not have been, and was not, completed until September 26, 2005. "It only became clear, after the completion of the depositions of the Ziades' experts, that the entirety of the Ziades' proof and the entirety of the medical evidence was that the death occurred. . . . more than two years prior to the filing of the complaint." Id. at 40-41. The defendants argue that they "promptly prepared and filed [their] motion for summary judgment" and the motion to amend their answer, as soon as it became known that the testimony of the Ziades' experts would be "uniform and un-contradicted" as to the timeliness issue. Id. at 39. Thus, they insist, they demonstrated good cause for amending their answer less than 42 days before the trial date. We agree. *Page 1076 
"Summary judgment is appropriate only when `there is no genuine issue as to any material fact and . . . the moving-party is entitled to a judgment as a matter of law.'" Perry v. City ofBirmingham, 906 So.2d 174, 175 (Ala. 2005) (quoting Ala. R. Civ. P. 56(c)(3)); see also Dobbs v. Shelby County Econ. Indus. Dev. Auth., 749 So.2d 425 (Ala. 1999). "The court must accept the tendencies of the evidence most favorable to the nonmoving party and must resolve all reasonable factual doubts in favor of the nonmoving party. . . . In reviewing a summary judgment, an appellate court, de novo, applies the same standard as the trial court." Perry,906 So.2d at 175.
Summary judgment would not be appropriate on the timeliness issue if there existed a genuine issue as to when the fetusdied. More specifically, if there was substantial evidence indicating that the fetus died on or after September 11, 2000, there was no basis for a summary judgment.
In his September 6, 2005, deposition, Dr. Greene testified at length regarding the timing of the fetus's death:
 "Q. [Defendants' counsel:] Do you feel that the baby was healthy on September 2[, 2000]?
 "A. [Dr. Greene:] I believe it was determined that the baby was not healthy on [September] 2.
 ". . . .
 "Q. What do you base that on?
 "A. The fact that the baby was determined to be dead on September 12, that the condition of the baby on its birth on September 14 would indicate it had been dead a fair amount of time.
 "Q. How long?
 "A. I would defer to a placental or pathology expert on that. That's — there's not an abundance of evidence in the autopsy report that I saw, and I am not really an expert in that particular area, as far as timing fetal death, and I don't intend to offer an opinion, other than just to say it was greater than 48 hours, that's for sure; greater than, probably, 4 or 5 days, for the skin to be sloughed off and —
 "Q. Has he shown you the report from his expert?
 "A. No, I haven't seen a report from the expert. I saw the pathology report.
 "Q. Has he discussed with you what Dr. Schwartz is going to say?
 "A. No.
 "Q. Do you know Dr. Schwartz?
 "A. Yes.
 "Q. Did you suggest Dr. Schwartz to him?
 "A. I did.
 "Q. And would you say that Dr. Schwartz has greater expertise than you in areas, say, of timing fetal death?
 "A. As with respect to looking at the condition of an expired fetus, certainly
 "Q. But, basically, what you're telling me is, in your view, the baby had been dead for a good while before [Mrs. Ziade] came in on September 12?
 "A. That's right.
 ". . . .
 "Q. Well, is there any clearer statement you can give me about — and again, if this is something you want to say, `Let Dr. Schwartz handle this,' that's fine; I just don't want to get surprised later. Is there any clearer statement you want to make about Dr. Greene's opinion about time of death other than it was certainly more than 48 hours before she presented [on *Page 1077 
September 12]? Is that what you said?
 "A. That's correct.
 "Q. On [September] 12, maybe as long as, I think Dr. Schwartz says a week earlier, do you have any —
 "A. I would defer to him with respect to the exact time of fetal death.
 "Q. But you're comfortable with more than 48 hours?
 "A. I am.
 ". . . .
 "Q. Just so I can put that in dates, if [Mrs. Ziade] presented on [September] 12 with a dead baby, we know that from the chart, right?
 "A That's correct.
 "Q. Then, in your opinion, the baby would have been dead at sometime prior to [September] 10?
 "A. That's correct.
 "Q. And as far as how far back that would go towards [September] 2, you would leave that for Dr. Schwartz?
 "A That's correct."
(Emphasis added.)
Dr. Schwartz, the Ziades' "placental pathologist" to whom Dr. Greene deferred in his deposition testimony, testified at length on the timing of the fetus's death. His September 22, 2005, deposition states, in pertinent part:
 "Q. [Defendants' counsel:] You say fetal demise of a minimum of seven days prior to delivery. So, would you say at least seven days and perhaps more? Is that what we're looking at here?
 "A. [Dr. Schwartz:] A minimum of seven days, yes, sir. And, like I said, there's going to be some variability when we look at timing of fetal demise. . . . We obviously have to have a starting point. We have to have a median to our range, and mine would be seven days. Could it have been eight days? Yes, sir.
 "Q. And that would be eight days prior to delivery, as you pointed out, and that would be — delivery was on September 12, 2000, correct?
 "A. [Delivery was on September] 14, actually.
 ". . . .
 "Q. You're correct. So, just so I can get the dates to match up with our opinions, you would say fetal demise — the evidence to a reasonable degree of medical certainty would suggest fetal demise on or before the 7th of September?
 "A. Approximately the 7th of September. Could have been — also could have been sooner. But, you know, we — I'm talking about a mean or a modal.
 "Q. Your best opinion is all I'm —
 "A. My best opinion is seven days prior to delivery.
 ". . . .
 "A. There's also — another thing we look at to time fetal demise are degenerative changes of the chorionic. . . . And we, we're seeing areas of chorionic villi there that are essentially becoming degenerated or fibrotic with vascular collapse. And that really is a change that goes along with those septations that we see; also, in my opinion, is consistent with approximately seven days of intrauterine fetal demise prior to delivery.
 ". . . .
 "Q. And that evidence, in your best opinion, to a reasonable degree of medical certainty, would be consistent with fetal demise of a minimum of 7 days prior to September 14? *Page 1078 
"A. Yes, sir. It can start earlier than that. But, again, we have to look not just for the change, but how diffuse or pronounced the change is. And in my opinion, to the extent of diffuseness that we have it here, 7 days would be the most reasonable, in my opinion, timing for the fetal demise prior to delivery."
(Emphasis added.)
Dr. Battaglia, the last of the Ziades' designated experts, testified on September 26, 2005. When asked his opinion as to the date of the fetus's death, he deferred entirely to Dr. Schwartz. In other words, he stated that he would not offer an opinion on the date of death different from the one offered by Dr. Schwartz.
Once Dr. Battaglia had been deposed, it became apparent that there would be no expert testimony indicating that the fetus had died within the two-year limitations period. However, that fact could not be established before September 26, 2005, when the last of the Ziades' designated experts testified. Thereafter, the defendants had only a seven-day window in which to amend their answer without leave of court. These facts constitute goodcause for the defendants' failure to file the amendment outside the 42-day period. Thus, the trial court could have denied the amendment only for a "valid ground," such as "actual prejudice." 858 So.2d at 953.
In that connection, the Ziades contend that "[t]hetouchstone principle that called for denying the amendment and the summary judgment is undue prejudice."
Ziades' brief, at 19 (emphasis added). The Ziades insist that they were "boxed in" by the timing of the amendment, which prevented them from acquiring "expert proof . . . to refute the `earlier' date of death issue." Id. at 19-20. They argue that they were, therefore, prejudiced by the fact that the amendment was filed "after all expert discovery had been concluded." Id. at 17. We disagree.
Prejudice, in the context of Rule 15(a), Ala. R. Civ. P., amendment, simply "`means that the nonmoving party "must show that it was unfairly disadvantaged or deprived of the opportunity to present facts or evidence which it would have offered hadthe . . . amendments been timely."'" Ex parteGRE Ins. Group, 822 So.2d 388, 391 (Ala. 2001) (quotingCuffy v. Getty Ref Mktg. Co., 648 F.Supp. 802, 806
(D.Del.1986)). The Ziades were disadvantaged only to the extent that, because the discovery deadline had passed before the defendants moved to amend their answer, they were deprived of the theoretical opportunity to procure an expert who would refutethe unequivocal testimony of their three experts as to the date of death. That is not the type of prejudice contemplated by the amendment process. The trial court did not err, therefore, in allowing the amendment.[1]
 III. Limitations Period
The Ziades contend that the two-year limitations period should have begun running on September 14, 2000, the date of delivery. Thus, they argue, their action, which was filed on September 11, 2002, is not time-barred. It is undisputed that the Ziades' once-viable fetus was, in fact, dead on September 12, 2000, two days before delivery, and it is uncontroverted that the fetus died — at the latest — on September 10, 2000. In essence, the Ziades urge us to hold that the two-year limitations period begins to run in an action for the wrongful *Page 1079 
death of a viable fetus on the date of delivery, rather than on the date of the death in fact. This is so because, they insist, "a person cannot die until they areborn." Ziades' brief, at 32.
The Ziades cite no caselaw from this or any jurisdiction addressing this issue. They rely on the following patchwork of statutes contained in Title 22 of the Alabama Code, including Ala. Code 1975, § 22-9A-1(2); portions of the Alabama Determination of Death Act, Ala. Code 1975, § 22-31-1 etseq. ("the ADDA"), Alabama's version of the Uniform Determination of Death Act ("the UDDA"); and portions of the Alabama Uniform Anatomical Gift Act, Ala. Code 1975, §§22-19-40 to -47 ("the AUAGA"):
 "[§ 22-19-41:] For the purposes of this article, the following terms shall have the meanings respectively ascribed to them by this section:
 ". . . .
 "(2) DECEDENT. A deceased individual and includes a stillborn infant or fetus."
 "[§ 22-9A-1:] For the purposes of this chapter, the following words shall have the following meanings unless the context clearly indicates otherwise:
 ". . . .
 "(2) FETAL DEATH. Death prior to the complete expulsion or extraction from the mother of a product of human conception, irrespective of the duration of pregnancy and which is not an induced termination of pregnancy. The death is indicated by the fact that after the expulsion or extraction the fetus does not breathe or show any other evidence of life, such as beating of the heart, pulsation of the umbilical cord, or definite movement of voluntary muscles. Heartbeats are to be distinguished from transient cardiac contractions; respirations are to be distinguished from fleeting respiratory efforts or gasps."
 "[§ 22-31-1:] An individual who, in the opinion of a medical doctor licensed in Alabama, has sustained either (1) irreversible cessation of circulatory and respiratory functions, or (2) irreversible cessation of all functions of the entire brain, including the brain stem, is dead. A determination of death must be made in accordance with accepted medical standards."
(Emphasis added.)
The Ziades attempt to support their position by splicing selective portions of these sections into their argument. Specifically, they state:
 "Plaintiffs submit that because a determination of death can only be made by a medical finding that there is, in fact, irreversible cessation of all functions of the entire brain, including the brain stem [§ 22-31-1], with further findings that the criteria for fetal death have been satisfied [§ 22-9A-K2)], date of death determination can only be made by an Alabama physician [§ 22-31-1] after the stillbirth [§ 22-19-41(2)]."
Ziades' brief, at 30-31 (emphasis added). "In other words," they argue, "death will not be determined until a . . . physician [licensed in Alabama] carefully examines the fetus after
the fetus is born." Id. at 24. None of their experts is licensed in Alabama. Therefore, they contend, the fetus was legally dead only as so pronounced on September 15, 2000, by the physician performing the autopsy. We disagree with this approach.
The genesis of the UDDA can be traced to "improvements in resuscitative and supportive *Page 1080 
measures," contributing to a widely recognized need for the "formulation of a new criteria of death [in order] to deal with (1) increased [long-term-care] burdens on patients, families,and hospital resources . . . and (2) an obsolete criteria for determining death leading to a controversy in organtransplantation." Samantha Weyrauch, Acceptance ofWhole-Brain Death Criteria for Determination of Death: AComparative Analysis of the United States and Japan, 17 UCLA Pac. Basin L.J. 91, 96-99 (1999) (footnotes omitted). The most important contribution of the UDDA and the ADDA was the adoption of "brain death" as a legitimate alternative to the traditional "`standard for determining death,'" which "was couched in terms of `the permanent cessation and absence of respiration and circulation.'" Eric C. Sutton, Giving the Gift of Life: ASurvey of Texas Law Facilitating Organ Donation, 22 St. Mary's L.J. 959, 962-63 (1991) (footnote omitted). Indeed, it is the termination of life support as an alternative to the indefinite, artificial maintenance of existence, and as a prerequisite to vital-organ transfer, that is the implicit concern of the ADDA and the UDDA. See Gallups v. Cotter,534 So.2d 585, 588 (Ala. 1988) ("The [pre-ADDA version of Alabama's determination-of-death] statute . . . clearly contemplates the termination of life support systems
upon a determination of death." (emphasis added)); see also Ala. Code 1975, § 22-31-4 ("A person who acts in accordance with the terms of [the ADDA] is not liable for damages in any civil action or subject to prosecution in any criminal proceeding for his act."). Obviously, this concern has not the slightest application where the death of a fetus has indisputably occurred in the mother's womb.
Similarly, the AUAGA is, by definition, concerned only with organ donation and transplantation and has no application here. Indeed, the terms in § 22-19-41 expressly apply only to the AUAGA. Moreover, the definition in subsection (2) merely indicates that a "stillborn fetus" qualifies as a potential organ donor. Thus, that Code section does not aid the Ziades.
Neither does § 22-9A-1(2) support the Ziades' argument that fetal death must be dated post-delivery following a physical examination of the body and the umbilical cord. Not only is that definition also limited to the specific portion of the Code in which it appears, but the text expressly includes death that occurs — as in this case — "prior to . . . extraction from the mother." (Emphasis added.)
In short, none of the statutes cited by the Ziades, construed either separately or in concert, supports the Ziades' argument that the date of intrauterine death must — as a matter of law — be reckoned from the date of delivery. The statutes that are applicable, namely, § 6-2-38(a) and § 6-5-410, compel the contrary conclusion. Section 6-5-410 is the "source of the period of limitations" for all wrongful-death actions in this state, including § 6-2-38(a). Cofer v. Ensor,473 So.2d 984, 992 (1985). Section 6-5-410 provides, in pertinent part: "[A wrongful-death] action must be commenced within two years from and after the death of the testator or intestate." (Emphasis added.) That language is repeated in §6-2-38(a), requiring that an action for wrongful death "be commenced within two years from the death." (Emphasis added.) Nothing in the text of these statutes, with their emphasis on "the death," suggests that the term may turn on a technicality or a fiction. The Ziades' approach would, in a sense, create two deaths — an actual death, and a legal, or fictional, death to be used as the benchmark for the running of the limitations period. The Ziades urge us to adopt such *Page 1081 
a bright-line test for the sake of certainty and convenience.
Despite the ostensible convenience of such a rule, a line should not be so bright as to obscure reality. If expert testimony establishes that the fetus died, in fact, outside the two-year limitations period, the action will be time-barred. Plaintiffs who wait until one day short of two years after a fetus isindisputably dead in the womb do so at their peril. The undeniable reality is that this fetus was dead at least two daysbefore the date advocated by the Ziades as the benchmark date.[2]
For these reasons, the trial court did not err in entering a summary judgment for the defendants. That judgment is, therefore, affirmed.
AFFIRMED.
LYONS and HARWOOD, JJ., concur.
NABERS, C.J., and SEE, STUART, SMITH, and PARKER, JJ., concur specially.
BOLIN, J., concurs in the result.
[1] The defendants also contend that § 6-2-38(a)"cannot be waived for failure to plead within a responsive pleading." Defendants' brief, at 56 (emphasis added). Because we conclude that the answer was properly amended, we do not reach this issue.
[2] For the first time in their reply brief, the Ziades urge us to adopt a discovery rule in cases involving intrauterine death. They analogize this type of death with unexplained disappearances, sometimes referred to colloquially as "Enoch Arden cases," based on Alfred Lord Tennyson's poetical character, "who suddenly returns after a long absence from which he was not expected to return at all." Elizabeth S. Scott Robert E. Scott, Parents asFiduciaries, 81 Va. L.Rev. 2401, 2471 n. 198 (1995). It is well settled, however, that the Court will not entertain an argument made "for the first time in an appellant's reply brief." See Steele v. Rosenfeld, 936 So.2d 488, 493 (Ala. 2005) ("`[A] n argument may not be raised, nor may an argument be supported by citations to authority, for the first time in an appellant's reply brief.'" (quoting Improved Benevolent Protective Order of Elks v. Moss, 855 So.2d 1107, 1111
(Ala.Civ.App. 2003), abrogated on other grounds, Ex parte FullCircle Distribution, L.L.C., 883 So.2d 638
(Ala. 2003))).