953 So.2d 340 (2006)
James C. WHITE, Sr., and WhiteGroup, a partnership
v.
STATE FARM FIRE & CASUALTY COMPANY.
1040748.
Supreme Court of Alabama.
August 4, 2006.
Rehearing Denied September 22, 2006.
*342 Ted Taylor, Leah O. Taylor, and Rhonda P. Chambers of Taylor & Taylor, Birmingham, for appellant.
Bert S. Nettles and Mark D. Hess of Haskell Slaughter Young & Rediker, LLC, Birmingham, for appellee.
LYONS, Justice.
James C. White, Sr., and WhiteGroup, a partnership, appeal from a summary judgment entered in favor of State Farm Fire & Casualty Company. We reverse and remand.

I. Factual Background and Procedural History

WhiteGroup is a partnership that buys, sells, owns, and manages real estate; White is the managing partner. WhiteGroup owns an office building located in downtown Birmingham that it leases to Banks, Finley, White & Company, an accounting firm (hereinafter "BFW"). White is also the managing partner of BFW. WhiteGroup insured its office building with State Farm.
*343 WhiteGroup's insurance policy with State Farm provided that State Farm would "pay for accidental direct physical loss to buildings at the premises described in the Declarations caused by an insured loss" to the extent the loss exceeded the $250 deductible. The applicable "Conditions" in the "Loss Payment" section of the policy provided that State Farm could "repair, rebuild or replace the property with other property of like kind and quality" in order to settle a loss. The "Conditions" section also imposed upon the insured certain duties in the event of a loss, including the duties to "take all reasonable steps to protect the covered property from further damage" and to "keep a record of your emergency and temporary repair expenses." The policy further provided that it was rendered void if the insured "intentionally conceal[s] or misrepresent[s] a material fact concerning . . . a claim under this policy."
On Friday, February 16, 2001, an intense thunderstorm struck downtown Birmingham in the late afternoon. WhiteGroup's office building suffered extensive wind damage from the storm, which blew off portions of the roof; as a result of damage to the roof, the interior of the building suffered water damage. Early on Monday morning, February 19, Doris Ladd, the office manager for BFW, telephoned the office of WhiteGroup's State Farm agent, Don Taylor, to report the storm damage. Zane Smith in Taylor's office told Ladd that the claim would be reported to State Farm's claim office and that someone from that office would contact WhiteGroup. Ladd then began contacting commercial-roofing contractors. Later that day, Brian DeCicco from State Farm's claim office telephoned Ladd. Ladd says that DeCicco told her that because of the widespread damage in the Birmingham area caused by the storm, it might be as long as a week before an adjuster could inspect the building. Ladd testified in her deposition that when she expressed concern about the lengthy delay because it was still raining and the storm damage was severe, DeCicco "said to me to do the repairs and keep the receipts." She further testified that she did not recall DeCicco saying anything about the repairs being temporary.
White then contacted Chip Braswell at Quality Architectural Metal & Roofing, Inc. ("Quality Roofing"), about repairing the damaged roof. Braswell visited the WhiteGroup office building on February 20 and met with White.[1] Braswell inspected the roof and temporarily covered the portions of the roof that had sustained the heaviest damage to prevent further water damage in the building. The WhiteGroup building had what is referred to as a "built-up" roof consisting of asphalt and gravel. A built-up roof is applied by alternating plies of tar/asphalt and a base coat of felt paper or fiberglass.
On February 21, Braswell transmitted to White by facsimile a proposal to repair the roof by replacing the built-up roof with a roof consisting of a single-ply rubber membrane, described by Quality Roofing as a "fully adhered EPDM single-ply roofing system." A single-ply roof is applied by gluing a rubber membrane to the roof's substrate and taping the seams together. The price for the EPDM roof stated on the February 21 proposal was $43,395. Braswell also explained to White that time was of the essence in having a new roof installed, *344 not only because the building had sustained heavy damage, but also because the company was receiving so many requests for roofing repairs.
At some point after February 21, Quality Roofing prepared an amended proposal dated February 23 to apply the EPDM roof for $39,950. In his deposition, Braswell testified that the lower price was attributable to White's "negotiating skills," and that White "got [him] down some" on the price. That February 23 proposal was in the Quality Roofing file. However, White testified that he never received a proposal for $39,950 and that he first learned of the February 23 proposal when Quality Roofing sent him an invoice on May 30 for $39,950.
Because of the widespread damage caused by the February 16 thunderstorm and the number of claims generated as a result of it, State Farm dispatched to Birmingham a national catastrophe team ("CAT team"), consisting of a group of adjusters supervised by a team manager. CAT team adjusters travel to the affected area from various locations throughout the United States. A CAT team adjuster from Minnesota, Ella Lingard, was assigned to the WhiteGroup claim. Jim Roche was Lingard's CAT team manager. Lingard met with White on February 22, took pictures, and measured the roof. White presented to Lingard the February 21 proposal from Quality Roofing in the amount of $43,395. White stated that during a telephone conversation Lingard had from his office with someone in her office, he overheard her indicate that the claim had been approved. He testified that Lingard authorized him to proceed with the repairs and that she told him it would be a day before State Farm had the check processed for the claim. At that point, White signed the February 21 proposal to signify his acceptance of it and forwarded it to Quality Roofing. Quality Roofing prepared to begin work on February 23.
On February 23, Lingard telephoned White at 7:42 a.m.; White had not yet arrived at the office, and Lingard left him a message to call her back. White tried to return Lingard's call several times during the day, but he was unable to reach her. She eventually telephoned him and left another message, stating that she needed a signed copy of the Quality Roofing proposal and asking whether the proposed new roof was an upgrade.
On February 24, White again attempted to return Lingard's telephone call. He was unable to reach her, but he spoke with someone named Shaun at State Farm. White told Shaun he would fax the signed proposal to State Farm as Lingard had requested. Ladd faxed the February 21 proposal and confirmed that it was received. White also told Shaun that the proposed new roof was not an upgrade.
On February 26, Quality Roofing began work at the WhiteGroup building. On February 28, White tried to contact Lingard to inquire about the status of the claim, but he was never able to reach her. He eventually left a message with someone named "Miami" at a State Farm office. By March 1, White had become frustrated because he had heard nothing from Lingard. He telephoned his agent, Don Taylor, and complained about his problems communicating with Lingard and about the fact that he had not yet received the check for payment of the roof.
Taylor then telephoned Jim Roche, the CAT team leader, who in turn telephoned White. When White told Roche he had been trying to reach Lingard about the status of his check, Roche told White that Lingard had returned to Minnesota. White says Roche told him that Lingard had not done a good job on the roof claim and that she did not normally handle commercial *345 buildings and was not experienced in that area. State Farm says that Lingard had to leave Birmingham because of a family emergency.
Roche told White that State Farm's estimate for the replacement of the roof was $21,316.91. State Farm arrived at this estimate by using a computerized estimating tool called "Xactimate." White told Roche that both DeCicco and Lingard had told him to have the roof repaired and that he would send Roche a letter outlining the chronology of the events that had occurred up to that point. White wrote that letter on March 2.
State Farm reassigned Lingard's CAT claims to Steve Harrison, an independent adjuster State Farm hired to assist with storm-damage claims in the Birmingham area. Harrison took over all of Lingard's claims except the WhiteGroup roof claim, which Roche handled himself. Harrison handled WhiteGroup's claims for damage to the interior of the building and its business-interruption claim. On March 5, Harrison met with White to review the estimate from a general contractor to repair the interior damage to the building. Quality Roofing completed the replacement of the roof on March 14. In a letter dated March 20, Harrison sent WhiteGroup a check for $47,799.46, representing State Farm's payment for the damage to the interior and exterior of the building, an amount that included the estimated cost to install a built-up roof, a lesser sum than White claimed had been approved, and a check for $3,449.65, representing State Farm's payment for the water-damaged personal property. State Farm later sent WhiteGroup a check for $55,059.65, representing State Farm's payment of WhiteGroup's business-interruption claim.
White wrote Roche again on March 23 regarding the denial of the full amount of the roof claim. Roche replied on March 26, in which he maintained that neither DeCicco nor Lingard had authorized White to repair the roof. Roche's letter stated: "The difference between [State Farm's] settlement and your demand is the cost of the upgraded roof that was installed." On April 11, White sought legal counsel regarding State Farm's refusal to pay for the replacement of the roof. After White retained counsel, State Farm gave him "the benefit of the doubt" and offered in August 2001 to pay the difference between its estimate and the Quality Roofing proposal. State Farm says it did so because it had been provided with additional evidence indicating that the replacement roof was not an upgrade. White and WhiteGroup rejected State Farm's offer.
Whether the EPDM roof was an upgrade over the built-up roof that existed at the time of the storm is disputed by the parties. White testified that to him the new roof was not an upgrade because it had only a 10-year warranty whereas the roof it replaced had a 20-year warranty. Braswell testified that the EPDM roof was not an upgrade. He said the difference was that a single-ply roof was more economical than a built-up roof. "When you compare insulation, warranty, sheet metal and scope, everything is apples and apples, single-ply is going to be cheaper." Braswell also testified that in his opinion State Farm's estimate of $21,316.91 to replace the WhiteGroup building roof with a built-up roof was incomplete, omitting sheet metal, costs for a crane, building permit, warranty, insulation, tools, and equipment, and labor costs, thus omitting $25,423 in total additional estimated costs.
White and WhiteGroup sued State Farm and Taylor. The complaint alleged bad-faith failure to pay an insurance claim in State Farm's failing to properly investigate the claim and in failing to properly subject the results of its investigation to a *346 cognitive evaluation and review, breach of contract, misrepresentation in that DeCicco and Lingard stated to White that WhiteGroup could proceed to repair the roof, and negligent and/or wanton failure on State Farm's part to adequately supervise and monitor Lingard's activities. State Farm and Taylor's answer included several affirmative defenses, but unclean hands, contributory bad faith, or comparative bad faith was not among them.
State Farm and Taylor filed a motion for a summary judgment in which they argued that State Farm had paid all benefits due under the policy and thus had not breached the contract, that State Farm had promptly paid or had offered to pay all policy benefits and that their actions were reasonable and not taken in bad faith, that White had not reasonably relied on any alleged misrepresentations made by State Farm agents, and that White was guilty of contributory bad faith, which, State Farm and Taylor argued, negated their liability. White and WhiteGroup opposed the summary-judgment motion, arguing that they had presented uncontroverted evidence indicating that State Farm employees had misrepresented to White that he could proceed to repair and replace the roof, that State Farm had breached the contract, and that an unsupported allegation that White may have acted in bad faith did not relieve State Farm and Taylor of their liability, or, alternatively, that whether White had acted in bad faith was a matter of disputed fact. White and WhiteGroup also argued that State Farm's refusal to pay the roof claim in its entirety was wrongful and without an arguable reason and that it had intentionally or recklessly failed to conduct an adequate investigation of the facts before denying the roof claim. Finally, White and WhiteGroup argued that State Farm negligently failed to adequately supervise and monitor Lingard.
John Hill, a section manager for State Farm, testified that under the loss-settlement clauses of WhiteGroup's policy covering the building, if the insured provides a signed contract for repairs, State Farm will pay replacement-cost benefits. Hill acknowledged that Lingard had a duty to tell White that State Farm would not pay the entire amount of the Quality Roofing proposal and acknowledged that there was no evidence in State Farm's claim file indicating that Lingard ever gave White that information. Hill stated that nothing in WhiteGroup's policy defined "like kind and quality," a phrase used to describe the nature of the replacement State Farm would cover. A loss-settlement clause in the policy refers to "like kind and quality" as well as "comparable material and quality." Hill testified that State Farm properly refused to pay the amount presented by the Quality Roofing proposal because the proposal was for an upgraded roof. Hill noted that Roche documented in the claim log on March 1 that the fact that the proposal was for an upgraded roof was "confirmed by the contractor." Hill also noted that there was no documentation by Roche of the identity of the person with whom he had confirmed that fact and no further notations of what that person had said. Without this notation, Hill stated, State Farm had no basis upon which to pay anything less than the amount presented in the proposal. Hill also stated that if State Farm authorized the repairs, it should have paid the entire $43,395 indicated in the proposal.
White and WhiteGroup's expert witness, Alesia Cook, a former State Farm specialist, testified that in her opinion Lingard and State Farm had violated certain duties in adjusting WhiteGroup's roof claim. According to Cook, Lingard failed to document any specific notes of her conversation with White, nor did she describe in any writing the damage to the roof. Further, *347 Lingard and State Farm failed to document any attempt to reconcile their estimate of the cost to replace the roof with that of Quality Roofing. Cook stated that State Farm also failed to properly document its position that the replacement roof was an upgrade. Cook also testified that in her opinion Lingard's use of Xactimate to compute the estimate was not proper because Xactimate is a residential estimating tool and should not be used for estimating commercial claims.
The trial court held a hearing on the motion for a summary judgment, after which the court found as a matter of law that White and WhiteGroup's claims were barred on the basis that White had unclean hands because he failed to advise State Farm that Quality Roofing had submitted a lower proposal than the proposal White submitted to State Farm. The trial court entered a summary judgment in favor of State Farm and Taylor on all claims. White and WhiteGroup appealed only from that aspect of the summary judgment entered in favor of State Farm.[2]

II. Standard of Review

"The standard by which this Court will review a motion for summary judgment is well established:
"`The principles of law applicable to a motion for summary judgment are well settled. To grant such a motion, the trial court must determine that the evidence does not create a genuine issue of material fact and that the movant is entitled to a judgment as a matter of law. Rule 56(c)(3), Ala. R. Civ. P. When the movant makes a prima facie showing that those two conditions are satisfied, the burden shifts to the nonmovant to present "substantial evidence" creating a genuine issue of material fact. Bass v. SouthTrust Bank of Baldwin County, 538 So.2d 794, 797-98 (Ala.1989); § 12-21-12(d)[,] Ala.Code 1975. Evidence is "substantial" if it is of "such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v. Founders Life Assur. Co. of Florida, 547 So.2d 870, 871 (Ala.1989).
"`In our review of a summary judgment, we apply the same standard as the trial court. Ex parte Lumpkin, 702 So.2d 462, 465 (Ala.1997). Our review is subject to the caveat that we must review the record in a light most favorable to the nonmovant and must resolve all reasonable doubts against the movant. Hanners v. Balfour Guthrie, Inc., 564 So.2d 412 (Ala. 1990).'"
Payton v. Monsanto Co., 801 So.2d 829, 832-33 (Ala.2001) (quoting Ex parte Alfa Mut. Gen. Ins. Co., 742 So.2d 182, 184 (Ala.1999)).

III. Analysis

A. Bad-Faith Failure to Pay an Insurance Claim

This Court in two recent cases has provided comprehensive discussions of the tort of bad-faith failure to pay an insurance claim. In Employees' Benefit Ass'n v. Grissett, 732 So.2d 968 (Ala.1998), we stated:
"[National Security Fire & Casualty Co. v. Bowen, 417 So.2d 179 (Ala.1982),] *348 set out these requirements for a plaintiff to prove a bad-faith failure to pay:
"`(a) an insurance contract between the parties and a breach thereof by the defendant;
"`(b) an intentional refusal to pay the insured's claim;
"`(c) the absence of any reasonably legitimate or arguable reason for that refusal (the absence of a debatable reason);
"`(d) the insurer's actual knowledge of the absence of any legitimate or arguable reason;
"`(e) if the intentional failure to determine the existence of a lawful basis is relied upon, the plaintiff must prove the insurer's intentional failure to determine whether there is a legitimate or arguable reason to refuse to pay the claim.'
"417 So.2d at 183. Requirements (a) through (d) represent the `normal' case. Requirement (e) represents the `abnormal' case.
"The rule in `abnormal' cases dispensed with the predicate of a preverdict JML [judgment as a matter of law] for the plaintiff on the contract claim if the insurer had recklessly or intentionally failed to properly investigate a claim or to subject the results of its investigation to a cognitive evaluation. Blackburn v. Fidelity & Deposit Co. of Maryland, 667 So.2d 661 (Ala.1995); Thomas v. Principal Financial Group, 566 So.2d 735 (Ala.1990). A defendant's knowledge or reckless disregard of the fact that it had no legitimate or reasonable basis for denying a claim may be inferred and imputed to an insurer when it has shown a reckless indifference to facts or proof submitted by the insured. Gulf Atlantic Life Ins. Co. v. Barnes, 405 So.2d 916, 924 (Ala.1981).
"So, a plaintiff has two methods by which to establish a bad-faith refusal to pay an insurance claim: he or she can prove the requirements necessary to establish a `normal' case, or, failing that, can prove that the insurer's failure to investigate at the time of the claim presentation procedure was intentionally or recklessly omissive."
732 So.2d at 976 (footnote omitted).
In State Farm Fire & Casualty Co. v. Slade, 747 So.2d 293 (Ala.1999), we elaborated on the rule in the "abnormal" case:
"[W]e reject the Slades' argument that in the abnormal bad-faith case in which the insurer fails to properly investigate the insured's claim contractual liability is not a prerequisite to bad-faith liability, and the Slades' argument that the tort of bad faith provides a cause of action that is separate and independent of an insurance contract. In so doing, we make it clear that in order to recover under a theory of an abnormal case of bad-faith failure to investigate an insurance claim, the insured must show (1) that the insurer failed to properly investigate the claim or to subject the results of the investigation to a cognitive evaluation and review and (2) that the insurer breached the contract for insurance coverage with the insured when it refused to pay the insured's claim.
"This is nothing new. Under the elements established in [National Security Fire & Casualty Co. v.] Bowen, [417 So.2d 179 (Ala.1982)], the plaintiff has always had to prove that the insurer breached the insurance contract. Practically, the effect is that in order to prove a bad-faith-failure-to-investigate claim, the insured must prove that a proper investigation would have revealed that the insured's loss was covered under the terms of the contract." *349 747 So.2d at 318. In Singleton v. State Farm Fire & Casualty Co., 928 So.2d 280, 283 (Ala.2005), we reviewed the discussion in Slade of the previously recognized distinction between "normal" and "abnormal" bad-faith cases:
"In the `normal' bad-faith case, the plaintiff must show the absence of any reasonably legitimate or arguable reason for denial of a claim. [State Farm Fire & Cas. Co. v.] Slade, 747 So.2d [293] at 306 [(Ala.1999)]. In the `abnormal' case, bad faith can consist of: 1) intentional or reckless failure to investigate a claim, 2) intentional or reckless failure to properly subject a claim to a cognitive evaluation or review, 3) the manufacture of a debatable reason to deny a claim, or 4) reliance on an ambiguous portion of a policy as a lawful basis for denying a claim. 747 So.2d at 306-07. . . .
"`Bad faith . . . is not simply bad judgment or negligence. It imports a dishonest purpose and means a breach of known duty, i.e., good faith and fair dealing, through some motive of self-interest or ill will.' Slade, 747 So.2d at 303-04 (quoting Gulf Atlantic Life Ins. Co. v. Barnes, 405 So.2d 916, 924 (Ala. 1981))."
Thus, White and WhiteGroup have two available methods by which they can establish a bad-faith refusal to pay an insurance claim. They can prove the requirements necessary to establish a "normal" case, or they can prove that one or more of State Farm's actions consists of bad faith in an "abnormal" case. Moreover, in an "abnormal" case, State Farm cannot use ambiguity in the contract as a basis for claiming a legitimate or arguable reason for not paying the claim. Otherwise, an insurance company would have the incentive to write an ambiguous policy in order to create a defense to a bad-faith claim.
White and Whitegroup argue that they can prove the requirements necessary to establish both a normal bad-faith case and an abnormal bad-faith case. As to the "normal" bad-faith claim, White and WhiteGroup argue that on March 20, 2001, State Farm paid a portion of their roof claim based on the estimate generated by State Farm's Xactimate computer program, rather than the full amount of the Quality Roofing proposal, thereby breaching the contract between WhiteGroup and State Farm. White and WhiteGroup argue that State Farm based its partial denial of the claim on an incomplete and inadequate estimate prepared by an adjuster who had left Birmingham during the process of adjusting the claim, failing to document any specifics of her conversation with White and failing to describe the damage to the roof. White and WhiteGroup also argue that State Farm failed to properly document its position that the EPDM roof was an upgrade and that State Farm therefore had no reasonably legitimate or arguable basis for failing to pay the entire roof-replacement claim.
As to the "abnormal" bad-faith claim, White and WhiteGroup argue that State Farm failed to properly investigate the validity of their claim and failed to subject the results of any investigation it did conduct to a cognitive evaluation and review. White and WhiteGroup argue that, when Lingard left Birmingham, State Farm had only an inadequate computer estimate from an inexperienced adjuster who had made no attempt to reconcile the estimate with "real life" estimates, and that Roche, the supervisor who took over the claim after Lingard left, conducted no further investigation. It is undisputed that although a notation in the claims file indicates that Roche confirmed with "the contractor" that the new roof was an upgrade from the one being replaced, Roche did not document with whom he spoke or what the *350 individual had said. Braswell testified in his deposition that the roof was not an upgrade and that he did not recall telling anyone from State Farm that it was an upgrade.
State Farm argues that White and WhiteGroup did not present substantial evidence indicating that State Farm breached the contract because, it argues, its investigation demonstrated that the new EPDM roof and the old built-up roof were not "of like kind and quality." Further, State Farm argues, it promptly reopened its investigation to consider new claim information submitted on WhiteGroup's behalf.[3] State Farm further argues that even if White and WhiteGroup can show that it breached the contract, they must prove not only a mere nonpayment of a claim, but also must prove that the nonpayment was in bad faithi.e., without any reasonable ground for dispute. If any one of its reasons for denying the claim is at least arguable, State Farm contends, then White and WhiteGroup cannot prove bad faith. Even if its investigation was not perfect, State Farm says, the presence of a built-up roof on the building at the time of the storm, the ready availability of the same type of replacement roof after the storm, and WhiteGroup's election nevertheless to install a rubber-membrane roof were legitimate and arguable reasons for State Farm to conclude that it owed White and WhiteGroup only the cost of a replacement built-up roof.
Based on the present state of the record in this case, we conclude that material questions of fact exist that make a summary judgment on the bad-faith claim improper. White and his office manager, Ladd, testified that two different State Farm agents told them to repair the roof. White insists that Lingard not only authorized him to proceed with the repairs, but she also told him it would be a day before State Farm had the check processed for the claim. White says no one at State Farm ever told him that there was a question whether State Farm would pay the claim. John Hill, a State Farm manager, testified that if State Farm authorized the repairs, then it should have paid the entire $43,395 proposed by Quality Roofing. Other State Farm employees testified, however, that if Lingard had indeed authorized White to proceed with the repairs proposed by Quality Roofing, it would not have been necessary for her to have prepared an estimate, which she did.
As to the question whether the EPDM roof was an upgrade, the evidence is also disputed. The sole basis for State Farm's argument that the roof was an upgrade is a notation in the claim file by Roche, Lingard's manager, that stated only that the Quality Roofing proposal of $43,395 was "due to an upgrade" and that that had been "confirmed by the contractor." Braswell disputes the characterization of the rubber-membrane roof as an upgrade. Notably, the record contains no testimony from either Lingard nor Roche. The policy provides no assistance. Certainly the two roofs are different, but the term "upgrade" is not mentioned, much less defined, in the policy. The policy provides that State Farm will replace damaged property with property "of like kind and quality." Whether the EPDM roof was "of like kind and quality" as compared to a built-up roof is a critical question that cannot be answered at this stage in these proceedings.
*351 At this point in the proceedings, we cannot determine whether the alleged bad faith in this case is of the normal or abnormal variety. Further proceedings are necessary before a fact-finder can determine whether State Farm breached its contract with WhiteGroup; if it did, whether that breach was in bad faith; and if it did not, whether one or more of its actions consisted of bad faith in an "abnormal" case. Moreover, we cannot determine whether White was guilty of bad faith. The testimony concerning when and whether he knew that Quality Roofing had revised its proposal from $43,395 to $39,950 is disputed.[4] Upon the present state of the record, we pretermit consideration at this time of whether Alabama should recognize "contributory bad faith" on the part of the insured as a defense to the tort of bad-faith failure to pay an insurance claim, and if we should recognize that defense, what effect it would have upon the tort of bad faith.

B. Misrepresentation

We now turn to White and WhiteGroup's misrepresentation claim. Concerning such a claim, we stated in Slade:
"[W]e disagree with State Farm's contention that there is no separate tort of fraud or fraudulent suppression in the handling of an insurance claim. An insurer's conduct in connection with the denial of a claim made under its policy may support a fraud action even in a setting where the insured alleges a bad-faith refusal to pay a claim. Jones v. Alabama Farm Bureau Mut. Cas. Co., 507 So.2d 396, 401 (Ala. 1986). To support such a claim, however, the insurer must have induced the insured to act, or to fail to act, in reliance on the alleged fraud. Id. at 401."
747 So.2d at 320.
White and WhiteGroup state that they agreed to Quality Roofing's proposal and that they became obligated to pay for the new roof only after Lingard authorized them to proceed with the repairs to the roof. In his March 2 letter to Roche, White stated that on February 22, "Ella Lingard, State Farm adjuster, came out and took pictures, measured roof and measured interior, received a copy of the proposal from Quality Roof and gave us another claim number. . . . Ms. Lingard indicated that she would be handling our file and that we should go ahead and get our roof repaired as discussed with Brian DeCicco."[5] White further stated that while Lingard was at his building, she "called her office and talked to someone about the situation," and that he "overheard [Lingard] indicating that we had received approval from someone at State Farm and we did have a claim number." White then stated in the letter:
"Ms. Ella Lingard indicated very clearly to us that we should move forward and get the roof repaired because of the impending damages that could result to the interior from rain getting into the building. It appeared that Ms. Lingard communicated this to her manager or someone at State Farm."
In his deposition, White testified as follows:

*352 "Q. Is it your position that you felt like you had authorization to get that roof fixed, whatever it cost?
"A. Yes.
"Q. Based on what you understood Mr. DeCicco to say?
"A. Correct.
"Q. Without a bid, or ever being presented it?
"A. Oh, yeah. I mean, . . . his statement to Ms. Ladd, as she stipulated to me, as pointed out here in thison the 19th, was to make the repairs and keep all the receipts. He did not stipulate that you need to get some bids and submit some bids to us, or do anything, because it will be a week before an adjuster will be out, see. So the building wasn't going to hold a week.
"Q. Is it possible that Mr. DeCicco told Ms. Ladd to get temporary repairs done and keep the receipts? Temporary repairs, like as shown in the invoice from Quality with the dates of February 19th and February 21st on it?
". . . .
"A. I don't think it wasI think it's possible the agent said exactly what's stipulated here in these notes. And furthermore, Ms. Lingard, when she was there, the temporary repairs had been made. So as she stipulatedas she stated, go on and get it repaired as discussed with Brian DeCicco. If she was only talking about the temporary repairs, they had already been done.
"Q. All right. Do you know if Ms. Lingard knew that the temporary repairs had already been done?
"A. I escorted her on top of the roof, and she observed them.
"Q. Okay. So it's your testimony that you were authorized to do these repairs even before you had received the bid from Quality?
"A. Yes.
". . . .
Q. Continuing with your entry for February 22, you state that Ms. Lingard called her office and talked to someone about the situation.
"A. Uh-huh.
"Q. And you overheard her indicating that we had received approval from someone at State Farm, and we did have a claim number, is that right?
"A. Uh-huh.
"Q. But yourit's your testimony that Ms. Lingard, again, affirmatively extended authorization to make the repairs as discussed with DeCicco?
"A. Without question. Without question.
"Q. Okay.
"A. I mean, she stated while we were on the roof that, you know, y'all did a good job of going on and getting the temporary repairs done. Y'all need to proceed, you know, with this proposal here. And she took a copy of it. And then she got down off the building and . . . then she called her office on her cell phone to talk to someone, and she was explaining to them what she had. And then when she . . . I got down, she said, `well, you know, y'all just move right ahead on and get it done.' . . . "
Lingard's alleged authorization to White to proceed with repairing the roof constitutes a statement of existing fact rather than a misrepresentation as to an event to take place in the future that would implicate issues surrounding proof *353 of promissory fraud. Construing the facts in a light most favorable to the nonmovant, Payton v. Monsanto Co., 801 So.2d at 833, we note that White testified that after Lingard inspected the roof and after she had spoken by telephone with someone at State Farm,[6] she authorized him to have the roof repaired pursuant to the proposal from Quality Roofing, a copy of which White had provided to her. Therefore, White and WhiteGroup argue, they relied upon Lingard's representation, and that reliance was reasonable.[7]
State Farm contends that Lingard did not authorize White and WhiteGroup to proceed with the roof repair pursuant to the Quality Roofing proposal because, it argues, if she had so authorized the repairs, State Farm would have had no reason to have her inspect the roof and prepare a damage estimate. State Farm argues that because Quality Roofing presented its proposal before Lingard's visit to the building and it was the only contractor White considered, White could not have relied on Lingard's alleged representation in selecting Quality Roofing. State Farm also argues that although White may have approved the $43,395 offer presented by Quality Roofing on February 21, he was not bound by that proposal because he was later able to negotiate a better price of $39,950.
We conclude that material questions of fact exist that also make a summary judgment on the misrepresentation claim improper. The parties dispute whether Lingard authorized White to proceed with the roof repairs and whether his reliance on that representation was reasonable. Furthermore, the alleged renegotiated proposal for the roof replacement is again at issue, and as we have previously stated, whether and when White knew about that proposal before he received the invoice from Quality Roofing is disputed.

C. Negligent and/or Wanton Supervision

Finally, we address White and WhiteGroup's claim that State Farm negligently and/or wantonly failed to adequately supervise Lingard. White and WhiteGroup argue that Lingard used a software program to generate an estimate for repairing the roof that was appropriate only for use on residential roofing, not commercial roofing. White testified that Roche admitted to him that Lingard lacked experience *354 in adjusting commercial-roof claims and that she had not done a good job on the CAT team in Birmingham. State Farm adamantly denies that any such admissions were ever made. As we have previously noted, conspicuously lacking in the record before us is testimony from either Roche or Lingard. As in the bad-faith and misrepresentation claims, material questions of fact make a summary judgment improper as to the negligent and/or wanton supervision claim.
State Farm's refusal to pay White and WhiteGroup's claim is the proximate cause of any loss they experienced. The theory of State Farm's alleged negligent and/or wanton failure to supervise Lingard in permitting her to state incorrectly that State Farm would pay the claim is inconsistent with the theory that State Farm is obligated under the contract with WhiteGroup to pay the claim for the new roof. If she correctly stated the import of the contract, then no loss was suffered by her being negligently or wantonly supervised. However, Rule 8(e)(2), Ala. R. Civ. P., allows a plaintiff to assert inconsistent theories in the complaint; in such event the plaintiff may elect to submit one or both claims to the jury, whereupon the jury should be instructed to determine which claim is supported by the evidence. Here, if the trier of fact ultimately concludes that State Farm is not obligated to pay under the contract, then its failure to adequately supervise Lingard could be actionable on the basis of White's claim that Lingard led him to incur an expense he would otherwise not have incurred had she been properly supervised and had she not misled him as to approval of the claim. A summary judgment at this stage of the proceedings on the claim that State Farm failed to adequately supervise Lingard is premature.

IV. Conclusion

Because genuine issues as to material facts exist precluding a summary judgment on White and WhiteGroup's claims, we reverse the judgment entered by the trial court and remand the case for further proceedings.
REVERSED AND REMANDED.
SEE, HARWOOD, WOODALL, SMITH, BOLIN, and PARKER, JJ., concur.
STUART, J., concurs in the result.
NABERS, C.J., concurs in the result in part and dissents in part.
NABERS, Chief Justice (concurring in the result in part and dissenting in part).
I concur in the majority's decision to reverse the summary judgment for State Farm as to White and WhiteGroup's bad-faith, breach-of-contract, and negligent-supervision claims. I respectfully dissent, however, from the Court's decision to reverse the summary judgment as to the fraud claim. White and WhiteGroup's fraud claim is not based on a false representation of an existing fact. Instead, White and WhiteGroup allege that State Farm promised to pay for the EPDM roof but failed to perform on its promise. This presents a promissory-fraud claim and requires proof of intent to defraud at the time the promise is made. Mantiply v. Mantiply, 951 So.2d 638, 653 (Ala. 2006). Although there are disputed facts as to whether Lingard authorized repairs to the roof and whether White and WhiteGroup reasonably relied on that authorization, White and WhiteGroup have failed to present substantial evidence indicating that Lingard acted with the intent to defraud.
Because it is stated in the present tense, the statement that an insured "is authorized" to make repairs sounds as if it refers to an existing fact. It does not. "Authorization" is simply another way of saying *355 that the insurer promises to pay for the repairs in question. Absent evidence of intent to defraud, State Farm's failure to fulfill such a promise cannot serve as the basis for a fraud claim. Because we may affirm the judgment of a trial court for any valid reason, I would hold that White and WhiteGroup's failure to present substantial evidence of intent to defraud requires us to affirm the judgment as to the fraud claim.
NOTES
[1] There is some confusion about when Braswell first visited the WhiteGroup building. All of the testimony presented indicates that Braswell met with White on February 20 and made temporary repairs to the roof on that day. However, Braswell's invoice for temporary repairs indicates that they were made on February 19 and 21.
[2] White and WhiteGroup do not appeal from that aspect of the summary judgment entered in favor of Taylor. They have, therefore, waived any argument they may have had as to that aspect of the judgment. Waddell & Reed, Inc. v. United Investors Life Ins. Co., 875 So.2d 1143, 1167 (Ala.2003).
[3] Nothing in the record indicates what new information State Farm considered when it reconsidered its decision to pay only a portion of the claim for the replacement of the roof and offered to pay the balance of the claim.
[4] The trial court grounded its summary judgment for State Farm on a finding of unclean hands, although no such defense had been pleaded by State Farm. Assuming, arguendo, its availability, the conflicting evidence as to White's conduct does not permit us to affirm the summary judgment on this ground.
[5] The reference to a discussion with DeCicco presumably refers to the previously mentioned conversation between DeCicco and Doris Ladd, White's office manager, in which DeCicco, according to Ladd, authorized the repairs.
[6] White's contention that he overheard Lingard receive authorization from State Farm during a telephone conversation, standing alone, would not support a misrepresentation claim. See Seward v. Dickerson, 844 So.2d 1207 (Ala. 2002), in which this Court concluded that the donor of a winning lottery ticket could not have reasonably relied upon the recipient's alleged representation that if she won, she would share her winnings with her coworkers. We held that the recipient did not acquire the ticket from the donor by fraudulent misrepresentation because the representation was not made to the donor; rather, the donor merely overheard the recipient assent to a question asked of her by one of her coworkers.
[7] White testified that he relied upon the statement that the repairs had been authorized. That statement refers to an existing fact. The Chief Justice in his special writing states, "Because it is stated in the present tense, the statement that an insured `is authorized' to make repairs sounds as if it refers to an existing fact. It does not. `Authorization' is simply another way of saying that the insurer promises to pay for the repairs in question." 353 So.2d at 354-55. Under this reasoning, an event that has previously occurred (authorization of the repairs) is transformed into an event yet to take place because the past event contemplates additional action in the future based on the fact of the previous event. Such a construction of the evidence violates the established rule that on a motion for a summary judgment the court must accept the tendencies of the evidence most favorable to the nonmoving party. Ziade v. Koch, 952 So.2d 1072 (Ala. 2006).