Larry Williams and his wife Melissa Williams sued State Farm Fire and Casualty Company ("State Farm") and its employees, Brandon LaBresh, Tim Ryan, and Bill Lovell, on July 10, 2001, alleging breach of an insurance contract, bad-faith refusal to pay an insurance claim, negligent handling of claims, and negligent training and supervision. The Williamses sought both compensatory and punitive damages, as well as damages for mental anguish.
State Farm answered the complaint on August 8, 2001, denying the allegations in the complaint, and it moved the trial court to dismiss the counts alleging negligent handling of claims and negligent training and supervision. The defendant employees LaBresh, Ryan, and Lovell also moved the trial court on August 8, 2001, to dismiss the complaint against them in its entirety. Following a hearing, the trial court, on October 10, 2001, entered an order dismissing the count alleging negligent handling of claims as to all of the defendants; dismissing the counts alleging breach of contract and bad faith as to the defendant employees LaBresh, Ryan, and Lovell; and deferring ruling on the count alleging negligent supervision and training as to all of the defendants.
On September 30, 2002, State Farm moved for a summary judgment as to all of the remaining claims against it. On February 4, 2003, the Williamses filed a response in opposition to State Farm's motion for a summary judgment. The Williamses amended their complaint on April 2, 2003, to more fully allege their breach-of-contract claim.
Following a hearing, the trial court, on July 25, 2003, entered a summary judgment in favor of State Farm, LaBresh, Ryan, and Lovell on all of the remaining counts of the complaint except the breach-of-contract claim asserted against State Farm.[2]
The case proceeded to trial on August 27, 2003, on the Williamses' breach-of-contract claim against State Farm. At the close of the Williamses' case and again at the close of all of the evidence, State Farm moved the court for a preverdict judgment as a matter of law ("JML"). The motions were denied and the case was presented to the jury. The jury returned a verdict in favor of the Williamses and awarded them compensatory damages on the breach-of-contract claim in the amount of $72,000 and also awarded the Williamses damages for mental anguish in the amount of $10,000, for a total award of $82,000. The trial court assessed interest in the amount of $12,600 on the jury's award of damages on the breach-of-contract claim and, on September 9, 2003, entered a final judgment in favor of the Williamses for $94,600.
State Farm, on September 26, 2003, moved the trial court for a postverdict JML, or, in the alternative, to alter, amend, or vacate the judgment or to remit the compensatory-damages award, arguing that the award on the breach-of-contract claim was greater than the limits contractually agreed to by the parties under the terms of the policy and, further, that the *Page 1011 
evidence presented was insufficient to support the jury's award of damages for the Williamses' mental-anguish claim.
On December 29, 2003, the trial court entered an amended order remitting the damages award for the breach-of-contract claim to the policy limit of $49,047, and reassessing interest on that award in the amount of $8,583.23. The trial court left intact the jury's award of $10,000 on the mental-anguish claim. The trial court entered a judgment in favor of the Williamses for $67,630.23. State Farm appeals.
The Williamses' house is a one-story, wood-frame house which consists of six rooms and one bathroom. The foundation of the house consists of concrete block walls surrounding a crawl space. The house was insured by a policy of insurance issued by State Farm. The insurance policy in "Section I — Losses Insured" provides that "[w]e insure for accidental direct physical loss to the property described in COVERAGE A [Dwelling], except as provided in SECTION I — LOSSES NOT INSURED." (Capitalization in original.) The insurance policy provides in "Section I — Losses Not Insured" the following:
 "1. We do not insure for any loss to the property described in Coverage A which consists of, or is directly and immediately caused by, one or more of the perils listed in items a. through n. below, regardless of whether the loss occurs suddenly or gradually, involves isolated or widespread damage, arises from natural or external forces, or occurs as a result of any combination of these:
 "a. collapse, except as specifically provided in SECTION I — ADDITIONAL COVERAGES, Collapse;
". . . .
"i. mold, fungus, or wet or dry rot;
". . . .
"m. birds, vermin, rodents, insects. . . ."
(Capitalization in original.)
The insurance policy provides in "Section I — Additional Coverages" the following:
 "11. Collapse. We insure only for direct physical loss to covered property involving the sudden, entire collapse of a building or any part of the building.
 "Collapse means actually fallen down or fallen into pieces. It does not include settling, cracking, shrinking, bulging, expansion, sagging or bowing.
 "The collapse must be directly and immediately caused only by one or more of the following:
". . . .
 "b. hidden decay of a supporting or weight-bearing structural member of the building;
 "c. hidden insect or vermin damage to a structural member of the building. . . ."
The insurance policy further provided that State Farm would pay the cost to "repair or replace with similar construction . . . the damaged part of the property covered."
The Williamses contend that on September 28, 2000, two small explosions occurred inside their house. Larry Williams testified that he was asleep in the master bedroom when he heard a "big bang." Larry went to investigate the sound and found his wife Melissa, and his son's girlfriend, Chrystal Trevino, "screaming and hollering." Larry stated that he asked what had happened and Trevino responded that she had turned on the light switch and an explosion had occurred. Larry testified that he then turned on the light switch and a loud "combustion" type explosion occurred. Larry stated that reddish and blue flames were visible from the base of the floor and walls at the moment of the *Page 1012 
explosion. The main floor beam that ran through the center of the Williamses' kitchen had collapsed, which caused the kitchen floor to collapse. The City of Talladega Fire Department responded to the scene, but no fire was detected. However, a gas leak was found under the kitchen floor and Alagasco was called to the scene to disconnect the gas supply to the house. The electricity to the house was also disconnected.
State Farm hired two experts to investigate the cause of the damage to the Williamses' house. Jeff Crain, a certified fire and explosion investigator employed by Pyrtech, Inc., inspected the Williamses' house on October 4, 2000. He found no evidence of any fire damage within or beneath the flooring system of the house and no evidence of a flammable gas or vapor explosion. Crain concluded that the collapse of the flooring system was caused by the failure of an extremely rotted main support beam underneath the house.
Joel D. Wehrman, a senior engineer with Jade Engineering 
Inspection, Inc., inspected the Williamses' house on October 11, 2000, to determine what caused the flooring system to collapse and also to provide recommendations on how to proceed with repairs. Wehrman concluded that no fire or explosion had occurred; rather, he determined that the flooring system failed because of long-term wood rot of the flooring support joists caused by an infestation of termites and a fungus. Wehrman stated that when the flooring system finally collapsed, it probably made a very loud noise and generated a dust cloud, causing the Williamses to believe an explosion had occurred. Wehrman concluded that it would not be feasible to repair the rot-related damage the house sustained. He determined that half of the wood-framed floor in the house would have to be replaced in its entirety and that the rotted floor support beams and joists would have to be replaced.
The collapse of the kitchen floor rendered the Williamses' house uninhabitable, and they moved into a local motel room. During the period the Williamses resided in the motel room, State Farm paid them benefits under the "Loss of Use" provision of their homeowners' insurance policy. However, on December 6, 2000, State Farm notified the Williamses by letter that there was no coverage for their loss under the insurance policy, and it discontinued the "Loss of Use" benefits. The Williamses then sued State Farm and its employees, LaBresh, Ryan, and Lovell.
State Farm argues on appeal that the trial court erred in denying its preverdict JML because, it says, the Williamses failed to prove their damages, which is an essential element of their breach-of-contract claim. The standard of review for a ruling on a motion for a JML is as follows:
 "When reviewing a ruling on a motion for a JML, this Court uses the same standard the trial court used initially in granting or denying a JML. Palm Harbor Homes, Inc. v. Crawford, 689 So.2d 3 (Ala. 1997). Regarding questions of fact, the ultimate question is whether the nonmovant has presented sufficient evidence to allow the case or the issue to be submitted to the jury for a factual resolution. Carter v. Henderson, 598 So.2d 1350 (Ala. 1992). For actions filed after June 11, 1987, the nonmovant must present `substantial evidence' in order to withstand a motion for a JML. See § 12-21-12, Ala. Code 1975; West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala. 1989). A reviewing court must determine whether the party who bears the burden of proof has produced substantial evidence creating a factual dispute requiring resolution by *Page 1013 
the jury. Carter, 598 So.2d at 1353. In reviewing a ruling on a motion for a JML, this Court views the evidence in the light most favorable to the nonmovant and entertains such reasonable inferences as the jury would have been free to draw. Motion Industries, Inc. v. Pate, 678 So.2d 724 (Ala. 1996). Regarding a question of law, however, this Court indulges no presumption of correctness as to the trial court's ruling. Ricwil, Inc. v. S.L. Pappas Co., 599 So.2d 1126 (Ala. 1992)."
Delchamps, Inc. v. Bryant, 738 So.2d 824, 830-31 (Ala. 1999). In order to prevail on a breach-of-contract claim, a plaintiff must establish: (1) the existence of a valid contract binding the parties, (2) his own performance under the contract, (3) the defendant's nonperformance under the contract, and (4) resulting damages. State Farm Fire Cas. Co. v. Slade, 747 So.2d 293
(Ala. 1999).
On direct examination, counsel for the Williamses attempted to elicit from Larry his estimation as to what it would cost to replace the house. Counsel for the Williamses asked Larry if he knew the reasonable value of his house before the "explosion" on September 28, 2000. State Farm objected to the question stating that the difference between the value of the house before the floor collapsed and the cost to replace "[was] not proper damages [in] this case." The trial court permitted Larry to testify as to the value of his house before the "explosion." Larry valued the house at $49,000 before the "explosion" and stated that it was worthless after the "explosion." No additional evidence was presented relative to the costs to repair the house.
State Farm then moved the trial court for a preverdict JML at the close of the Williamses' case, arguing, among other things, that the Williamses had failed to submit any evidence as to the proper measure of damages in the case. Counsel for State Farm stated:
 "The policy clearly calls for the repair or the replacement of the damaged property. There is no evidence before Your Honor or this jury that this was a total loss or that this house was totally destroyed to which you can even get into possible before and after value in the opinion of the homeowner as to the loss."
The following colloquy then occurred:
 "THE COURT: How about the issue concerning damages he just brought up?
 "COUNSEL FOR THE WILLIAMSES: Your Honor, we proved what their own expert — it is in because all of the exhibits are in. All of the exhibits are in, which have been premarked. Their own expert said that this house could not be repaired. . . .
 "COUNSEL FOR STATE FARM: That is not what [the Jade Engineering report] says.
 "COUNSEL FOR THE WILLIAMSES: The plaintiffs testified the house could not be repaired. The Jade Engineering report shows that the house couldn't be repaired and the proper measure of damages. Had they chosen to come in and attempt to repair this, they would have had the option to repair or replace.
"COUNSEL FOR STATE FARM: The damaged property.
 "COUNSEL FOR THE WILLIAMSES: They chose to back off and not do that. The Jade Engineering report — this was their engineer. We premarked all these exhibits. They were all admitted this morning. Your Honor asked us to do that. The Jade Engineering report shows this house could not be effectively repaired. *Page 1014 
". . . .
 "COUNSEL FOR STATE FARM: . . . [The Jade Engineering report] does not say the house cannot be repaired.
 "COUNSEL FOR STATE FARM: With regard to the recommendation for repairs that we requested that Mr. Wehrman look into, Mr. Wehrman simply states unfortunately, `I do not think it will be feasible to repair the extensive rot related damage sustained to the Williams's house.' There is no question they would have to replace the beam and everything, but it doesn't say the whole house is not — needs to be replaced. And that is a misstatement to the Court. . . .
 "COUNSEL FOR THE WILLIAMSES: Could His Honor simply look at this? This is their own expert, Your Honor. That is in because they premarked it, and we offered all the exhibits. This is their own engineering expert.
 "THE COURT: He didn't say it was completely [un]inhabitable. The parts of it he inspected —
 "COUNSEL FOR THE WILLIAMSES: He said it wasn't feasible to repair it.
 "THE COURT: The extensive rotrelated damage. He didn't say it about the whole house. The question I have is did you get the testimony in from your client relative to the house couldn't be repaired?
 "COUNSEL FOR THE WILLIAMSES: Yes, sir, Your Honor. Mr. Williams testified when we went into the agricultural [sic] report that was done and I asked him if based on all of the evidence that he was given from Mr. LaBresh, from all the investigations done, if that house could be lived in, if it was capable — if they could move into that house and live [in] it, and he said that no, he could not. That house was uninhabitable.
 "COUNSEL FOR STATE FARM: That was in its present condition, not in its repaired condition. There is no testimony as to how it would be replaced, what it would cost to do that. Their only evidence of damages is assuming there was a total loss, and there is no evidence there is [a] total loss.
 "COUNSEL FOR THE WILLIAMSES: Your Honor, their expert says it cannot be feasible to repair. You couldn't live in a house with no kitchen floor. If it can't be repaired, it is uninhabitable as it is. Their expert says it is not feasible to repair.
 "COUNSEL FOR STATE FARM: Just so we are clear. He is saying the damaged part cannot be repaired. It has got to be replaced. You lift the house up, you put in a new system, and you put the house down. That is what that report says."
Following the exchange quoted above, the trial court permitted the Williamses to reopen their case-in-chief for the limited purpose of presenting evidence as to the costs to repair or replace the damaged portion of their house. The following exchange occurred:
 "COUNSEL FOR THE WILLIAMSES: Mr. Williams, I'm going to ask you regarding the damage to your home from September 28, 2000, have you sought any information to find out what it would cost to repair or replace that damage to your home?
"LARRY WILLIAMS: Yes, I have.
 "COUNSEL FOR THE WILLIAMSES: Could you tell the ladies and gentlemen of the jury in your opinion what it will cost to repair the property that was damaged on September 28, 2000? *Page 1015 
 "COUNSEL FOR STATE FARM: Excuse me, Mr. Williams. Judge, we would object because obviously his opinion is going to be based on hearsay information, and she has not laid the proper foundation for him to render this testimony. In fact, this man told us earlier he didn't even own a saw. He is not qualified to render any opinion in regard to repairs of his home.
 "COUNSEL FOR THE WILLIAMSES: Your Honor, he sought out information regarding the repair of his home.
 "COUNSEL FOR STATE FARM: Judge, that would be hearsay because we don't even know the information that he sought out or received. She has not laid the proper foundation.
 "COUNSEL FOR THE WILLIAMSES: I will lay further foundation.
"THE COURT: Okay.
 "COUNSEL FOR THE WILLIAMSES: Could you tell the jury, without telling them any contents of the conversations, who did you speak with regarding repair or replacement of your property?
". . . .
"LARRY WILLIAMS: Davis Construction.
". . . .
 "COUNSEL FOR THE WILLIAMSES: Did Davis [Construction] come out to the house and look around?
"LARRY WILLIAMS: They did.
 "COUNSEL FOR THE WILLIAMSES: Did you have a conversation with them regarding the damage to your home?
"LARRY WILLIAMS: Pretty much, yes.
"THE COURT: Who was it with specifically?
". . . .
"LARRY WILLIAMS: It was [Mr. Davis's] son.
". . . .
 "COUNSEL FOR THE WILLIAMSES: And from those conversations and from his investigation out at your home, did you come up with an opinion, a figure, regarding what it would cost to repair or replace your property that was damaged on September 28?
 "COUNSEL FOR STATE FARM: Excuse me, Mr. Williams. Judge, I would object. The very foundation of her question is based on a conversation — that is hearsay in its purest form. He is basing the opinion on hearsay.
 "COUNSEL FOR THE WILLIAMSES: Your Honor, he has testified that he was there. They went to the home, that an investigation was done regarding what it would take to replace or repair it. From that, he has an opinion as to what the cost would be.
 "COUNSEL FOR STATE FARM: Judge, the opinion is derived from what someone apparently told him. There has been no discussion whatsoever of Mr. Davis's expertise. But secondly, it came from Mr. Davis. It is hearsay.
". . . .
 "THE COURT: He can give his opinion and his judgment as to what he believes the fair and reasonable cost of repairing or replacing the damage to his house is on that occasion.
". . . .
 "COUNSEL FOR THE WILLIAMSES: Do you have an estimate or an opinion or your best judgment as to what it would take as far as the cost to replace the property damage, *Page 1016 
September 28, 2000 — from that time frame in your best judgment, what it is going to take to repair that property?
 "COUNSEL FOR STATE FARM: Once again, I will object because there is no foundation for him to give that opinion. If we are relying on what someone told him, that is hearsay. If you are trying to get it through him, him having some expertise, they haven't proven or laid that foundation.
 "THE COURT: I think there may be an exception to that general rule in being a homeowner.
 "COUNSEL FOR STATE FARM: Judge, being a homeowner, you can prove the reasonable market value. There is no rule for replace or repair. Just the same he wouldn't be qualified to say what it cost to fix his automobile.
 "THE COURT: I am going to let him go ahead and give it at this time. . . .
 "COUNSEL FOR THE WILLIAMSES: In your best judgment, what will it cost to replace the property that was damaged September 28, 2000, to your home?
"LARRY WILLIAMS: Replace?
"COUNSEL FOR THE WILLIAMSES: To replace it.
"LARRY WILLIAMS: Around $79,000
 "COUNSEL FOR THE WILLIAMSES: In your best judgment, what will it cost to repair the property that was damaged on September 28, 2000?
 "LARRY WILLIAMS: I would say around $31,500 or $32,000."
Larry testified on cross-examination that the testimony he gave regarding the estimated costs to repair his damaged property were based solely on what someone else had told him and that he did not possess the expertise to estimate the cost to repair his damaged property. We note the following exchange:
 "COUNSEL FOR STATE FARM: The testimony you just gave us was based solely upon what someone else told you, wasn't it?
 "LARRY WILLIAMS: Close proximity. I mean, you know, it could be more.
 "COUNSEL FOR STATE FARM: But that came from whoever you talked to, and those figures are exactly what they told you, isn't it?
 "LARRY WILLIAMS: I would say somewhere around the neighborhood of that, yes.
 "COUNSEL FOR STATE FARM: You didn't come up with those figures, in other words, independently on your own?
 "LARRY WILLIAMS: I don't have that expertise to do that.
 "COUNSEL FOR STATE FARM: And so the information you just relayed to the jury came from another source, didn't it?
"LARRY WILLIAMS: Yes."
State Farm contends that the Williamses failed to carry their burden of proving the element of damages because the only evidence as to the proper measure of damages was presented after the trial court allowed the Williamses to reopen their case-in-chief and after State Farm had moved for a preverdict JML. As mentioned above, the insurance policy provides that the proper measure of damages in this case is the cost to repair orreplace the damaged part of the dwelling. See Reliance Ins. Co.v. Substation Prods. Corp., 404 So.2d 598 (Ala. 1981). Counsel for the Williamses elicited in their case-in-chief, and over the objection of State Farm, the cost of replacing the Williamses'house by ascertaining from Larry the difference in the value of the *Page 1017 
house before the "explosion" and the value of the house after the "explosion."[3] The Williamses presented no evidence in their case-in-chief relating to the cost to repair the damaged portion of their house. Thus, when State Farm moved for its preverdict JML, the Williamses had failed to present any evidence as to the proper measure of damages in this case, i.e., the cost to repair or replace the damaged portion of their house. However, the trial court allowed the Williamses to reopen their case-in-chief for the limited purpose of presenting evidence relative to the cost of repairing the damaged portion of their house. We note that the decision to reopen a case for additional evidence lies within the sound discretion of the trial court.Green Tree Acceptance, Inc. v. Standridge, 565 So.2d 38 (Ala. 1990). We find no error in the trial court's allowing the Williamses to reopen their case-in-chief for the limited purpose of presenting additional evidence relative to the issue of damages.
We must next determine whether the evidence as to the issue of damages in this case was competent. State Farm argues that the trial court erred in overruling its hearsay objection to Larry's testimony regarding the estimated costs to repair his damaged property. Rule 801, Ala. R. Evid., defines hearsay as "a statement, other than one made by the declarent while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Larry's testimony regarding the cost of repairing his damaged house was clearly based on a conversation with someone else and on what someone else had told him. The testimony was offered for the truth of the matter asserted, i.e., to establish damages, an essential element of a breach-of-contract claim, by proving the costs necessary to repair the Williamses' damaged house. Therefore, Larry's testimony as to damages constituted classic hearsay and was inadmissible. See Welch v. Montgomery Eye Physicians, P.C.,891 So.2d 837 (Ala. 2004) (holding that wife and son's testimony that deceased optometrist told them an agreement existed for the sale of his practice was hearsay); Atmore Farm Power Equip. Co. v.Glover, 440 So.2d 1042 (Ala. 1983) (holding that purchaser's testimony establishing model year of a tractor in fraud action based on what manufacturer told purchaser would be inadmissible hearsay).
Citing Mississippi Valley Title Insurance Co. v. Malkove,540 So.2d 674 (Ala. 1988), the Williamses argue that Larry's testimony regarding the estimated cost to repair the house constituted opinion evidence from a lay person and, as the owner of the property, he was competent to give an opinion relative to the cost to repair the house. Malkove states that "`[i]t is the rule in Alabama that any person, including a layman, is competent to testify as to his opinion concerning the value of land if he has had an opportunity for forming a correct opinion and testifies in substance that he has done so.'" 540 So.2d at 679
(quoting Calvin Reid Constr. Co. v. Coleman, 397 So.2d 145
(Ala.Civ.App. 1981)). However, the facts of Malkove are easily distinguishable from the facts of this case. First, Larry was not *Page 1018 
testifying as to the market value of his house, rather he was testifying to the estimated cost of repairing the damaged portion of the house. Secondly, the Court in Malkove found the proponents of the opinion testimony regarding the value of the land to be experienced real-estate brokers familiar with the land in question. Larry, on the other hand, admitted that he did not have the training or expertise necessary to allow him to form an independent estimate of the costs necessary to repair his house.
Accordingly, we conclude that the Williamses failed to present substantial evidence of an essential element of their breach-of-contract claim — damages — and that the trial court erred in denying State Farm's motion for a preverdict JML. Because we find that the Williamses failed to prove an essential element of their claim, we pretermit discussion of the remaining issues raised on appeal by State Farm. We reverse the trial court's judgment and remand the case for the entry of a JML for State Farm.
REVERSED AND REMANDED WITH INSTRUCTIONS.
NABERS, C.J., and SEE, HARWOOD, and STUART, JJ., concur.
[2] The record does not indicate that the defendant employees LaBresh, Ryan, and Lovell moved for a summary judgment. However, the trial court stated in its order that it considered matters outside the pleadings; thus the trial court apparently treated the defendant employees' motion to dismiss as a summary-judgment motion. See Boles v. Blackstock, 484 So.2d 1077 (Ala. 1986).
[3] Nothing in the record indicates that the Williamses' house was a total loss. In fact, the report prepared by Wehrman of Jade Engineering and relied on by the Williamses in support of their contention that the house cannot be repaired clearly indicates only that the damaged portion of the flooring system — not the entire house — cannot be repaired and must be replaced. SeePadgett v. State Farm Fire Cas. Co., 714 So.2d 302
(Ala.Civ.App. 1997) (holding that "replacement cost" provision in a policy similar to the Williamses' policy required the insurer to pay only for the damaged portion of a roof and not for the replacement of the entire roof).