COBB, Chief Justice.
Harold Jones and Pam Jones, plaintiffs in a bad-faith and breach-of-contract action in the Coffee Circuit Court, appeal from a partial summary judgment entered in favor of Alfa Mutual Insurance Company on the Joneses’ bad-faith claims. We affirm in part, reverse in part, and remand.

I. Factual Background and Procedural History

On October 4, 1995, Hurricane Opal made landfall along the Florida Gulf Coast. Much of south Alabama, including Coffee County, sustained damage as a result of the storm, which retained hurricane status as it arrived inland. The Joneses, who reside on their cattle farm in Coffee County, awoke on October 5, 1995, to find that their house, garage, and barn had suffered damage from the wind associated with Hurricane Opal. Specifically, the Joneses contend that there were cracks in their interior drywall, the seams in the drywall ceiling of their house were visible, cracks appeared in the mortar of the exterior brick veneer of their house, and there were loose bricks in the veneer. The Joneses also contend that a tree near their house was partially uprooted by the wind and that the tree fell onto and damaged the roof of their house. They further contend that at least one of the metal trusses in an addition to their barn was bent during the hurricane. The Joneses had a farm owner’s policy with Alfa at the time, and they submitted a claim to Alfa on October 6, 1995, for the damage to their property they say was caused by Hurricane Opal. At an unspecified date, two Alfa adjusters came to the Joneses’ residence to inspect the damage to the house. According to Harold Jones, the two adjusters noted the damage to the roof of his house. Harold Jones then showed the two adjusters damage to the drywall ceiling and the walls in his house. The adjusters told Jones that that damage was outside the realm of their expertise and that someone else would inspect that damage.
According to Pam Jones, Alfa agent Wendell Sanders came to the Joneses’ house soon after Hurricane Opal, looked at the house, and told the Joneses that they could proceed with replacing their roof. Sanders, however, testified that he did not make any such representation to the Joneses nor would he have had the authority to do so.
Alfa adjuster Gary Bradshaw also inspected the Joneses’ house. Bradshaw inspected the roof, walked around the exteri- or of the house, and noted cracks in the exterior brick veneer and interior drywall that Harold Jones contended were caused by Hurricane Opal. Bradshaw was uncertain about Harold Jones’s contention that the cracking of the brick veneer and drywall was the result of Hurricane Opal, and Bradshaw consulted his supervisor Hilton Godwin, an Alfa district claims manager, and the two determined that an engineer’s opinion was warranted. Alfa then hired structural engineer Ralph E. Jones to inspect the Joneses’ house and to render an opinion as to the causation of the cracks in the drywall and the brick veneer.
Ralph Jones inspected the Joneses’ house on November 13, 1995. Harold Jones and Bradshaw were both present during the inspection, and Harold Jones showed Ralph Jones various cracks in the exterior and interior of the house. Ralph Jones also inspected the crawl space under the house. During his inspection Ralph Jones never went into the attic or onto the *26 roof. While he was inspecting the interior of the house, Ralph Jones saw a crack in the fireplace surround. Ralph Jones stated that he asked Harold Jones about the crack and that Harold Jones told him that the crack had been present for an extended time.
According to Harold Jones, after Ralph Jones completed his inspection, Ralph Jones told Harold Jones that if the Joneses’ house was located in Montgomery County he would say the damage was most likely caused by soil settlement but that the soil in Coffee County did not tend to cause settlement problems in structures. Harold alleges that Ralph Jones continued by saying that it was his belief that wind had become trapped in the carport of the house during Hurricane Opal and that the trapped wind had lifted the roof and had shifted the top of the house. Harold Jones recalls that Pam Jones and possibly Bradshaw were present when Ralph Jones made this statement. Ralph Jones, however, testified by deposition that he did not recall making such a statement.
On December 4, 1995, Ralph Jones submitted a two-page written report on the Joneses’ house to Hilton Godwin. In his report, Ralph Jones wrote:
“It is my opinion that the brick cracks, caulk separations, [S]heetrock cracks, and related damage along the north and east sides of the carport are due to settlement of the foundation in the vicinity of the northeast corner of the carport, and that this settlement and damage was not caused by wind forces or otherwise related to Hurricane Opal.”
According to Bradshaw, he had a telephone conversation with Harold Jones the day after Bradshaw received Ralph Jones’s report. Bradshaw contends that he told Harold Jones that Ralph Jones’s report had arrived and that the cracks in the drywall and exterior brick veneer were not covered by the insurance policy and that Alfa would pay benefits only for the damage to the roof. Harold Jones, however, denies that Bradshaw ever told him that the claim would not be paid.
On December 29, 1995, Bradshaw wrote a letter to the Joneses’ attorney, Bruce McLean.[1] In this letter, Bradshaw stated:
“I understand that you are representing our above insured for a hurricane claim which was filed with ALFA for the October 4 hurricane that occurred in our area. Enclosed is an estimate for the replacement of the insured’s shingle roof and a draft representing payment less the deductible for that roof.
“I also understand that you are in possession of a copy of the engineer’s report which indicates that shifting and settlement of the insured house was not related to the hurricane winds. Should you have any questions concerning that report or any aspect of the insured’s claim or policy please feel free to give me a call. Also if there is any other damage that the insured has found as a result of the hurricane that we have not already addressed please have him to submit itemized estimates for those to *27 be considered. I thank you for your help and cooperation and look forward to hearing from you.”
According to the Joneses, there were no cracks in their exterior brick veneer and interior drywall before Hurricane Opal. They contend that Alfa knew that these cracks did not exist before Hurricane Opal. During the summer of 1995, Sanders came to the Joneses’ house to inspect the house for a “rewrite” of their farm owner’s policy. During his inspection, Sanders walked around the house and took photographs of the house. In his deposition, Sanders testified that he did not see any damage to the Joneses’ property during his inspection of the house.
Bradshaw called McLean about the Joneses’ claim on August 5, 1996. Alfa’s records state “[McLean] wasn’t sure if [Harold Jones] wanted to pursue this or not; [McLean] would check with [Harold Jones] to see.” On August 8, 1996, Sanders had a telephone conversation with Joy Richardson of Alfa’s underwriting department in which he stated that Bradshaw had spoken with the Joneses’ attorney and that the Joneses were dissatisfied with Alfa’s handling of their claim.
Also on August 8,1996, Bradshaw sent a memorandum to Richardson asking that the Joneses’ farm owner’s policy be canceled “based upon [the] engineer’s report after the hurricane that this house is suffering from settlement and structural damage, none of which was related to the storm but all attributed to the foundation.” Richardson responded to Bradshaw on August 13, 1996, stating the Joneses’ policy was to renew on September 9, 1996, that she did not receive Bradshaw’s memorandum until August 12,1996, that insufficient time existed to give 30 days’ notice of nonrenewal before the renewal date, and thus that the policy would be renewed, but it would be renewed for only 6 months. On August 13, 1996, Richardson also wrote a memorandum to Sanders directing him not to rewrite the Joneses’ policy because it was being renewed “as is” and that underwriting would make a final decision before the next renewal.
On October 17, 1996, Bradshaw adjusted a claim at the Joneses’ residence resulting from peanuts that had boiled over while cooking. While Bradshaw was adjusting that claim, Harold Jones reminded Bradshaw that Alfa had not yet paid for numerous problems the Joneses alleged were caused by Hurricane Opal. According to Harold Jones, Bradshaw stated, “I’m out here to take care of the peanut boil situation and that’s it.” Harold Jones also testified that Bradshaw informed him that Alfa had not ruled on the Joneses’ hurricane claim, that Alfa had not informed him how to handle the claim, and that as of that date there had been no settlement of the claim.
On or around January 14,1997, Richardson sent a memorandum to Sanders instructing him to raise the Joneses’ deductible at the next renewal. In response to the memorandum, Sanders called Richardson and inquired if Alfa could legally raise the deductible while a claim was pending. Richardson told Sanders that she would inquire as to whether Alfa could legally raise the deductible. On January 19, 1997, Alfa’s underwriting department signed off on the August 13, 1996, recommendation not to renew the Joneses’ farm owner’s policy. On January 20, 1997, Alfa closed the Joneses’ Hurricane Opal claim file and issued a $350 check to the Joneses for damage their barn sustained during the hurricane.
According to Sanders, he was unaware until March 1997 that the Joneses’ claim had been denied. Sanders stated that he had been told that Alfa “was working on” the claim. Pam Jones stated that on nu *28 merous occasions Sanders told the Joneses that he would take care of their claim and that there was no need to worry. According to both of the Joneses, Sanders told them that he would go to Montgomery and try to get their claim resolved. Sanders, however, stated that he never made any such offer. The Joneses contend that Sanders encouraged them not to pursue legal action on the claim, and Sanders admits that he would have asked them not to get a lawyer until an Alfa adjuster could talk to them.
On February 4, 1997, Alfa sent a letter to the Joneses notifying them that their farm owner’s policy was not being renewed as the result of “substantial change in the risk due to claims experience.” Harold Jones alleges that he had a conversation with Sanders about the nonrenewal, in which Sanders stated that he would go to Alfa’s headquarters in Montgomery on his day off to help the Joneses become rein-sured and that Sanders said “Alfa doesn’t stand a snowball[’s] chance in hell because your house was not in this condition two months prior to me renewing your insurance.” According to Sanders, he did not promise the Joneses he would go to Montgomery on their behalf, but he did contact the Montgomery headquarters about the nonrenewal by discussing the matter with Jim Short, who was in charge of Alfa’s underwriting department. Sanders also contends that he made no statement to the Joneses about the likelihood of success or failure of a legal claim by the Joneses against Alfa.
After their Alfa policy was not renewed, the Joneses attempted to find insurance coverage, but to no avail. Their mortgagor force placed a policy with $35,000 limits on their house.
In January and March 1997, the Joneses received questionnaires from Alfa regarding their satisfaction with Alfa’s handling of their 1995 claim. They also received a telephone call from an Alfa representative seeking their comments about the handling of their claim. A few days after the telephone call from the Alfa representative, Godwin telephoned the Joneses and asked about their complaints with the claims process. According to the Joneses, Godwin did not tell them that the claims that had not yet been settled had been denied.
On November 12, 1997, the Joneses built a fire in their fireplace for the first time since Hurricane Opal. That evening, a fire caused by a crack in the chimney damaged the Joneses’ house. The Joneses contend that the crack occurred during Hurricane Opal. The policy force placed by the mortgagor provided insufficient coverage to repair the Joneses’ house.[2]
On November 17, 1997, Ralph Jones, Godwin, engineer Owen Posey, and Alfa’s attorney Merrill Shirley visited the Joneses’ house. Pam Jones stated that the four visited the residence unannounced and without their permission. Alfa, however, contends that it notified the Joneses’ attorney before visiting the premises. According to Godwin, the purpose of the visit was “to have another engineer [Posey] come out to take a look at [the house] to see there again if there was anything that we had missed.”
In December 1997, Godwin had two other engineers inspect the Joneses’ house again. According to Godwin, “We had asked to have another engineer come out to take a look at it to see there again if there was anything that we had missed.”
On December 3, 1998, the Joneses filed a 12-count complaint against Alfa, Bradshaw, and Ralph Jones in the Coffee Cir *29 cuit Court. The defendants moved for a dismissal under Rule 12(b)(6), Ala. R. Civ. P., contending that the statutory limitations period had expired before the Joneses filed their action. The trial court granted the motion to dismiss only as to the Joneses’ claims of bad faith and negligent hiring and supervision against Alfa.
After discovery was completed, the defendants moved for a summary judgment on the remaining claims. The trial court entered a summary judgment for all defendants on all the remaining claims. The Joneses appealed the summary judgment as well as the dismissal of their bad-faith claims to this Court. On September 5, 2003, this Court affirmed the summary judgment as to all claims except the Joneses’ breach-of-eontract claim against Alfa, reversed the trial court’s dismissal of the Joneses’ bad-faith claims, and remanded the case to the trial court for further proceedings. Jones v. Alfa Mut. Ins. Co., 875 So.2d 1189 (Ala.2003) (“Jones I ”).
On November 17, 2004, Alfa moved for partial summary judgment on the Joneses’ bad-faith claims. In its motion for a partial summary judgment, Alfa argued that the Joneses had failed to file their action within two years of learning of facts that would have led to the discovery of an action for bad-faith refusal to honor the insurance policy and that their action was thus barred by the statute of limitations. Alfa alternatively argued that the Joneses had failed to state a cognizable claim upon which relief could be granted because, it said, Alfa had not acted in bad faith. The trial court entered a partial summary judgment in favor of Alfa on the bad-faith claims on September 6, 2006, concluding “that there is no genuine issue of material facts to [the Joneses’] bad faith claim.” The Joneses then moved the trial court to enter a Rule 54(b), Ala. R. Civ. P., order making its September 6, 2006, partial summary judgment final, which the trial court did on September 25, 2006. This appeal followed.

II. Standard of Review

“This Court’s review of a summary judgment is de novo. Williams v. State Farm Mut. Auto. Ins. Co., 886 So.2d 72, 74 (Ala.2003). We apply the same standard of review as the trial court applied. Specifically, we must determine whether the movant has made a prima facie showing that no genuine issue of material fact exists and that the movant is entitled to a judgment as a matter of law. Rule 56(c), Ala. R. Civ. P.; Blue Cross & Blue Shield of Alabama v. Hodurski, 899 So.2d 949, 952-53 (Ala.2004). In making such a determination, we must review the evidence in the light most favorable to the non-movant. Wilson v. Brown, 496 So.2d 756, 758 (Ala.1986). Once the movant makes a prima facie showing that there is no genuine issue of material fact, the burden then shifts to the nonmovant to produce ‘substantial evidence’ as to the existence of a genuine issue of material fact. Bass v. SouthTrust Bank of Baldwin County, 538 So.2d 794, 797-98 (Ala.1989); Ala.Code 1975, § 12-21-12.”
Dow v. Alabama Democratic Party, 897 So.2d 1035,1038-39 (Ala.2004).

III. Analysis

A. Are the Joneses’ bad-faith claims barred by the statute of limitations?

On appeal, the Joneses argue that the trial court erred in entering a summary judgment based on Alfa’s statute-of-limitations argument because, they claim, Alfa did not close the file on their claim resulting from Hurricane Opal until January 20, 1997, less than two years before they filed this action, and because Alfa’s actions following the issuance of Ralph *30 Jones’s report were not in accordance with the denial of the claim. Alfa, however, argues that Ralph Jones’s report, as well as Bradshaw’s letter of December 29,1995, sufficiently placed the Joneses on notice that their claim for damage to their drywall and brick veneer following Hurricane Opal was being denied.
In Jones I, this Court summarized the law concerning the statute of limitations of a bad-faith claim, stating:
“Bad faith is an intentional tort, Shelter Mutual Insurance Co. v. Barton, 822 So.2d 1149, 1154 (Ala.2001), and a species of fraud. Dumas v. Southern Guaranty Ins. Co., 408 So.2d 86, 89 (Ala.1981).
“ ‘The cause of action for bad faith refusal to honor insurance benefits accrues upon the event of the bad faith refusal, or upon the knowledge of facts which would reasonably lead the insured to a discovery of the bad faith refusal. The accrual of the tort of bad faith is a question of fact to be determined by the circumstances of each case.’
“Safeco Ins. Co. of America v. Sims, 435 So.2d 1219, 1222 (Ala.1983) (citation omitted). ‘The statute of limitations for bad faith claims arising on or after January 9, 1985, is for two years.’ ALFA Mut. Ins. Co. v. Smith, 540 So.2d 691, 692 (Ala.1988) (citations omitted).”
875 So.2d at 1193. Further, in regard to a statute of limitations, the Court has held:
“When a claim accrues, for statute-of-limitations purposes, is a question of law if the facts are undisputed and the evidence warrants but one conclusion. See LeBlang Motors, Ltd. v. Subaru of America, Inc., 148 F.3d 680 (7th Cir.1998); JN Exploration & Production v. Western Gas Resources, Inc., 153 F.3d 906 (8th Cir.1998); DXS, Inc. v. Siemens Medical Systems, Inc., 100 F.3d 462 (6th Cir.1996). However, when a disputed issue of fact is raised, the determination of the date of accrual of a cause of action for statute-of-limitations purposes is a question of fact to be submitted to and decided by a jury. Id.”
Kindred v. Burlington Northern R.R., 742 So.2d 155, 157 (Ala.1999).
Alfa argues that the December 29, 1995, letter from Bradshaw to McLean, as well as Ralph Jones’s December 4,1995, report, constituted a denial of the Joneses’ claim seeking proceeds for damage to the drywall and exterior brick veneer of their house. The Joneses aver that the facts are disputed and thus that summary judgment was not warranted on the statute-of-limitations issue. In support of their argument, the Joneses note that the December 29, 1995, letter from Bradshaw to McLean does not explicitly state that the claim was being denied and does not reference all the items the Joneses claimed were damaged by the hurricane. Likewise, the Joneses note that, according to Godwin’s deposition testimony, Alfa’s policy is to deny a claim orally whenever possible or, in the alternative, to deny the claim in writing. The Joneses testified that they had several face-to-face conversations with both Sanders and Bradshaw after Ralph Jones had completed his report, yet Alfa never orally denied the Joneses’ claim. In fact, Harold Jones testified that while he was adjusting the peanut-boil-over claim, Bradshaw informed him that Alfa had not ruled on the Joneses’ hurricane claim, that Alfa had not informed him how to handle the claim, and that as of that date there had been no settlement of the claim.
The Joneses argue that Alfa’s actions after Ralph Jones issued his report indicated that their claim had not been denied. They argue that after the report was issued Alfa invited them to submit additional *31 information to support their claim and that Alfa continued to investigate the claim for almost two years following Ralph Jones’s report. Specifically, they note that Alfa reinspected the Joneses’ house in November 1997 and again in December 1997.
The Joneses further argue that Alfa did not close the file on their hurricane claim until January 20, 1997, and that Alfa was making payments on the claim as late as that date, thus indicating that the claim was still open. Similarly they note that Sanders did not know that the claim had purportedly been denied and that he assured the Joneses on numerous occasions that their hurricane claim would ultimately be paid.
Alfa notes that this Court has previously held that “ ‘fraud is discoverable as a matter of law for purposes of the statute of limitations when one receives documents that would put one on such notice that the fraud reasonably should be discovered.’ ” Kelly v. Connecticut Mut. Life Ins. Co., 628 So.2d 454, 458 (Ala.1993) (quoting Hickox v. Stover, 551 So.2d 259, 262 (Ala.1989), overruled on other grounds, Foremost Ins. Co. v. Parham, 693 So.2d 409 (Ala.1997)). The sentence immediately preceding the above-quoted sentence from Kelly, however, states: “ ‘The question of when a plaintiff should have discovered fraud should be taken away from the jury and decided as a matter of law only in cases where the plaintiff actually knew of facts that would have put a reasonable person on notice of fraud.’ ” 628 So.2d at 458 (quoting Hicks v. Globe Life & Acc. Ins. Co., 584 So.2d 458, 463 (Ala.1991), overruled on other grounds, Foremost Ins. Co., supra); see also Gilmore v. M & B Realty Co., 895 So.2d 200, 210 (Ala.2004) (“ ‘ “[t]he question of when a party discovered or should have discovered the fraud is generally one for the jury” ’ ” (quoting Ex parte Seabol, 782 So.2d 212, 216 (Ala.2000), quoting in turn Liberty Nat’l Life Ins. Co. v. Parker, 703 So.2d 307, 308 (Ala.1997))). Bradshaw’s December 29, 1995, two-paragraph letter to McLean does not quote applicable policy language or explicitly state whether Alfa agreed with Ralph Jones’s report. Nor does it explicitly state that the claim has been denied as claim-denial letters typically do.
There is also evidence that Alfa took actions subsequent to writing the letter that could have led the Joneses to doubt whether their claim had been denied. Among other things, this includes Alfa’s continuing to investigate the cracks in the walls of the house, Bradshaw’s stating in October 1996 that Alfa had not instructed him as how to handle the Joneses’ claim and that it had not ruled on their claim, and the fact that Sanders, the Joneses’ insurance agent, was unaware until March 1997 that the claim had been denied. This Court cannot conclude as a matter of law that Alfa put the Joneses “on such notice that the fraud reasonably should [have been] discovered.” Kelly, 628 So.2d at 458.
A review of the evidence in a light most favorable to the nonmovant, the Joneses, indicates that genuine issues of material fact exist as to when Alfa actually denied the Joneses’ claim and as to when the Joneses would have or should have known of facts that would reasonably lead them to discover the denial. Thus, the partial summary judgment on the Joneses’ bad-faith claims is not barred by the statute of limitations.

B. Does a genuine issue of material fact exist as to the basis for the Joneses’ bad-faith claims?

In their complaint, the Joneses alleged both a “normal” bad-faith claim and an “abnormal” bad-faith claim. This Court has defined “normal” and “abnormal” bad faith in the following manner:
*32 “In the ‘normal’ bad-faith case, the plaintiff must show the absence of any reasonably legitimate or arguable reason for denial of a claim. [State Farm Fire & Cas. Co. v.] Slade, 747 So.2d [293] at 306 [ (Ala.1999) ]. In the ‘abnormal’ case, bad faith can consist of: 1) intentional or reckless failure to investigate a claim, 2) intentional or reckless failure to properly subject a claim to a cognitive evaluation or review, 3) the manufacture of a debatable reason to deny a claim, or 4) reliance on an ambiguous portion of a policy as a lawful basis for denying a claim. 747 So.2d at 306-07. ...
“ ‘ “Bad faith ... is not simply bad judgment or negligence. It imports a dishonest purpose and means a breach of a known duty, i.e., good faith and fair dealing, through some motive of self-interest or ill will.” ’ Slade, 747 So.2d at 303-04 (quoting Gulf Atlantic Life Ins. Co. v. Barnes, 405 So.2d 916, 924 (Ala.1981)).”
Singleton v. State Farm Fire & Cas. Co., 928 So.2d 280, 283 (Ala.2005). In order to recover on a “normal” bad-faith claim, the plaintiff must prove: “(1) the existence of an insurance contract; (2) an intentional refusal to pay the claim; and (3) the absence of any lawful basis for refusal and the insurer’s knowledge of that fact or the insurer’s intentional failure to determine whether there is any lawful basis for its refusal.” Acceptance Ins. Co. v. Brown, 832 So.2d 1, 16 (Ala.2001). “For a ‘normal’ bad-faith claim to be submitted to the jury, the underlying contract claim must be so strong that the plaintiff would be entitled to a preverdict judgment as a matter of law.” Shelter Mut. Ins. Co. v. Barton, 822 So.2d 1149, 1155 (Ala.2001). However, “ ‘[t]he rule in “abnormal” cases dispensed with the predicate of a preverdict JML [judgment as a matter of law] for the plaintiff on the contract claim if the insurer had recklessly or intentionally failed to properly investigate a claim or to subject the results of its investigation to a cognitive evaluation.’” White v. State Farm Fire & Cas. Co., 953 So.2d 340, 348 (Ala.2006) (quoting Employees’ Benefit Ass’n v. Grissett, 732 So.2d 968, 976 (Ala.1998)).

1. “Normal” bad faith

As to their “normal” bad-faith claim, the Joneses contend that there is no reasonable or justifiable ground for Alfa’s refusal to pay the disputed claim. In support of their argument, they note their own testimony that no cracks existed in the brick veneer or the drywall of their house before Hurricane Opal. They further argue that this testimony is supported by Sanders’s testimony that he did not see or recall seeing any damage or cracks to the exterior of the Joneses’ house when he inspected the house during the summer of 1995. The Joneses contend that upon inspecting their house after Hurricane Opal Ralph Jones informed them that he believed that wind had become trapped under the carport during Hurricane Opal, thus lifting and shifting the roof of the house, and that the soil in Coffee County was not prone to cause settlement. Likewise, the Joneses contend that Sanders told Harold Jones upon learning of the nonrenewal of the Joneses’ policy by Alfa that Alfa did not “stand a snowball[’s] chance in hell” of being successful if the claim was litigated because the cracks and other damage were not present when he inspected the house during the summer of 1995. The Joneses also contend that their case is analogous to this Court’s recent decision of White v. State Farm Fire & Casualty Co., supra. In White, a windstorm blew off portions of the roof of a building that housed a business, and the interior of the building suffered water damage. The business received an estimate for repair of the roof after the busi *33 ness’s office manager had a telephone conversation with an individual with State Farm’s claims office indicating that it should go ahead and repair the roof and keep the receipts for the work because it might be a week before a State Farm adjuster could visit the building. The business received an estimate to replace the roof with a roof consisting of a single-ply rubber membrane, although the damaged roof was a “built-up” roof. Six days after the storm, an adjuster with State Farm’s national catastrophe team inspected the building and authorized White, the managing partner for the owner of the building, to proceed with the repairs. The next day the adjuster left a telephone message for White, stating that she needed a signed copy of the roofing company’s proposal and needed to know whether the new roof was an upgrade. White attempted unsuccessfully to contact the adjuster and finally the next day spoke with someone at State Farm who told him to fax the signed proposal to State Farm, which White did. White also told the State Farm employee that the new roof was not an upgrade. White was unable to contact the adjuster, and ultimately contacted the leader of the national catastrophe team. The team leader told White that State Farm’s estimate for the roof replacement was approximately $20,000 less than the proposal from the roofing company. State Farm arrived at its estimate using a computerized estimating tool. State Farm then issued a check to the owner of the building for the damage to the exterior and interior of the building, including the amount of State Farm’s estimate for replacing the roof. Upon inquiry by White, the team leader maintained that the repair of the roof had been authorized. Only after White retained counsel did State Farm decide to give him “the benefit of the doubt” and offer to pay the difference between State Farm’s estimate and the roofing company’s proposal. White and his company rejected State Farm’s offer.
White and his company sued State Farm, alleging bad-faith failure to pay an insurance claim. The trial court entered a summary judgment in favor of State Farm, and White appealed. Reversing the summary judgment, this Court held:
“Based on the present state of the record in this case, we conclude that material questions of fact exist that make a summary judgment on the bad-faith claim improper. White and his office manager ... testified that two different State Farm agents told them to repair the roof. White insists that [the adjustor] not only authorized him to proceed with the repairs, but she also told him it would be a day before State Farm had the check processed for the claim. White says no one at State Farm ever told him that there was a question whether State Farm would pay the claim. John Hill, a State Farm manager, testified that if State Farm authorized repairs, then it should have paid the entire $43,395 proposed by Quality Roofing. Other State Farm employees testified, however, that if [the adjustor] had indeed authorized White to proceed with the repairs proposed by Quality Roofing, it would not have been necessary for her to have prepared an estimate, which she did.”
953 So.2d at 350.
The Joneses argue that the same thing that happened to White happened to them. They contend that Sanders told them two days after Hurricane Opal to proceed with repairs to their roof. Likewise, the Joneses allege that Ralph Jones told them that the cracks in the interior and exterior walls of their house were not caused by settlement and that he believed that wind had become trapped in their carport during Hurricane Opal, thus lifting and shift *34 ing the roof of their house. They further allege that Sanders repeatedly assured them that their claim would be paid.
Alfa, however, argues that White is distinguishable from this case because it was never disputed in White that the windstorm had caused the damage to the roof, whereas in this case whether the cracks in the walls of the house were caused by Hurricane Opal is disputed. Instead, Alfa notes that in White State Farm refused to pay the full cost to replace the roof, arguing that the new roof was an upgrade.
Alfa also argues that Adams v. Auto-Owners Insurance Co., 655 So.2d 969 (Ala.1995), and Chastain v. Baldwin Mutual Insurance Co., 495 So.2d 684 (Ala.Civ.App.1986), support their contention that the summary judgment should be affirmed. In Adams, an insured claimed roof damage caused by high winds and a severe thunderstorm. Both the insurer’s adjuster and an engineer hired by the insurer concluded that the vast majority of roof damage was caused, not by high winds or a thunderstorm, but by age and deterioration. This Court concluded that the investigations of the adjuster and engineer provided reasonably arguable and legitimate reasons for denying the insured’s claim; thus the summary judgment in favor of the insurer on the insured’s bad-faith claim was due to be affirmed. Likewise, in Chastain, the insureds contended the roof of their manufactured home was damaged by a storm, but the insurer’s adjuster who inspected the manufactured home found no evidence of damage to the manufactured home. In affirming the summary judgment in favor of the insurer as to the insureds’ bad-faith claim, the Court of Civil Appeals held that the insureds would not have been entitled to a directed verdict (now a judgment as a matter of law) on their breach-of-contract claim because a disputed question of fact existed as to whether the roof damage was caused by wind.
This Court agrees with Alfa that the Joneses’ claim is distinguishable from those in White because in White there was no question as to the cause of the roof damage. As this Court has previously held in regard to a judgment as a matter of law, “ ‘the ultimate question is whether the nonmovant has presented sufficient evidence to allow the case or the issue to be submitted to the jury for a factual resolution.’ ” State Farm Fire & Cas. Co. v. Williams, 926 So.2d 1008, 1012 (Ala.2005) (quoting Delchamps, Inc. v. Bryant, 738 So.2d 824, 830 (Ala.1999)). In other words, the nonmovant must present substantial evidence in order to withstand a judgment as a matter of law. We conclude that this matter is analogous to Adams, supra, and Chastain, supra, because it is apparent that Ralph Jones’s report creates a question of material fact that would preclude the Joneses from receiving a prever-dict judgment as a matter of law on the underlying breach-of-contract claim. Accordingly, we affirm the summary judgment on the Joneses’ “normal” bad-faith claim.

2. “Abnormal” bad faith

The Joneses also argue that the trial court erred in entering a summary judgment for Alfa on their “abnormal” bad-faith claim. They argue that Alfa intentionally or recklessly failed to investigate the claim because neither Ralph Jones nor Bradshaw ever inspected the roof of the Joneses’ house or their attic. Specifically, they argue that Ralph Jones focused exclusively on the foundation to the exclusion of all evidence available to him even though they had made a specific claim for roof damage and the hurricane had blown a tree onto the eave of their house. They also argue that neither *35 Ralph Jones nor Bradshaw gathered any “before and after” evidence from the Joneses or from any other source. The Joneses note that their expert witness, Andrew Beverly, stated that “[a]ny investigation by Alfa that did not include the above-described activities would not satisfy proper claims handling practice.”
In State Farm Fire & Casualty Co. v. Slade, 747 So.2d 293 (Ala.1999), this Court addressed a similar situation. In Slade, a retaining wall attached to the insureds’ house collapsed after it was struck by lightning, causing the ground around the pool area to give way. The insureds subsequently noticed cracking in the ceilings and interior and exterior walls of their house, and they informed their insurer of the cracks. The insured also had three separate firms determine what had caused the cracks, and all three reports indicated that the cracks were caused by settling and sifting of the soil beneath the house, which was caused by the collapse of the retaining wall. The insurer hired a structural engineer to inspect the house, but the insurer did not inform the structural engineer about the lightning strike nor tell the engineer that it was the insurer’s claim-handling policy to attempt to find coverage for the insured. The engineer was not qualified to conduct nor did he conduct an investigation regarding possible lightning damage. After visiting the property with the structural engineer, the insurer’s claims superintendent sent the insureds a reservation-of-right letter. The engineer concluded that the damage to the house was the result of “post-construction differential foundation settlement”; subsequently the insurer denied the insureds’ claim. However, the insurer did not communicate this to the insureds. Instead, the insurer refused to give the insureds a copy of the engineer’s report and continued to hire more engineers to investigate, even telling one engineer to investigate the property “with the purpose being to defend the insurance company against any claim of lightning-related, settlement, or structural damage.” Over five months after deciding to deny the claim, the insurer wrote a formal denial letter to the insureds. The insureds then sued the insurer, alleging various claims, including a claim of abnormal bad-faith failure to investigate. In affirming the trial court’s denial of the insurer’s motion for a judgment as a matter of law, this Court observed:
“ ‘The absence of a debatable reason not to pay a claim cannot be grounded on the vagaries of construction of an ambiguity.’ [Employees’ Benefit Ass’n v.] Grissett, 732 So.2d [968,] 977 [ (Ala. 1998) ]. An insurer can be liable for the tort of bad faith when it fails to properly investigate the insured’s claim. Thomas [v. Principal Fin. Group, 566 So.2d 735 (Ala.1990) ]. Here, the [insureds] produced substantial evidence, in the form of expert testimony, indicating that the term ‘dwelling’ did include their retaining wall. They also presented substantial evidence indicating that [the insurer] did not investigate their claim properly. The [insured] produced evidence indicating that [the insurer] never, in the course of its investigation, sent to their home someone who was qualified to conduct a lightning investigation. The [insureds] presented evidence indicating that [the insurer] never interviewed any of the witnesses present on the day lightning struck their retaining wall. The [insureds] presented expert testimony indicating that these omissions amounted to an improper investigation, on the basis that an investigation of a claim such as the [insureds] made required the use of a lightning expert. The [insureds] also presented evidence indicating that [the insurer] did not investigate lightning as a cause. The [in *36 sureds] produced evidence indicating that [the insurer] told its engineer ... to investigate a ‘possible soil problem’ and that it did not tell [the engineer] about the lightning strike. This evidence conflicted with [the insurer’s] ‘Good Faith Claims Handling’ video, which was admitted into evidence and which contained a statement that [the insurer’s] claims-handling policy was to attempt to find coverage.
“This evidence, the [insureds] say, shows that [the insurer] never investigated the possibility that lightning directly struck their dwelling, a fact, which if proven, would negate the application of the earth-movement exclusion. The [insureds] maintain that this failure created a question of fact as to whether [the insurer] properly investigated their claim, and, therefore, that the trial court properly submitted this portion of their bad-faith claim to the jury. We agree.
“Furthermore, [the insurer’s] argument on this point, i.e., that it cannot be held liable because it believes it properly investigated noncovered events and found evidence that noncovered events caused the [insureds’] loss, is unacceptable. An insurance company’s duty to investigate does not extend only to those events that are not covered. As this Court stated in [Aetna Life Insurance Co. v.] Lavoie, 505 So.2d [1050,] 1052-53 [ (Ala.1987) ], an insurance company has a ‘responsibility to marshal all ... facts’ necessary to make a determination as to coverage ‘before its refusal to pay.’ (Emphasis in original.) This duty must include a duty to investigate a covered event that an insured claims has caused his loss. Otherwise, the duty to properly investigate, imposed by the law regarding the tort of bad faith and recognized in [Gulf Atlantic Life Insurance Co. v.] Barnes, [405 So.2d 916 (Ala.1981)], would be meaningless. Therefore, we reject [the insurer’s] contention, and we hold that this portion of the [insureds’] bad-faith claim was properly submitted to the jury.”
Slade, 747 So.2d at 315-16.
Similarly, even though the Joneses filed a claim with Alfa for damage to their roof, even though the roof had clearly visible damage from the hurricane, and even though the Joneses contended that the damage to their house was caused by the hurricane, neither Bradshaw nor Ralph Jones inspected the roof or the attic during their investigation of the Joneses’ claim. It was not until after the Joneses’ house had been extensively damaged by fire and after Alfa had canceled the Joneses’ farm owner’s policy that Alfa sent Ralph Jones, along with three other engineers, to the Joneses’ house to reinspect the house, including the charred attic and roof. As Alfa’s attorney admitted during oral argument before this Court, Alfa sent the engineers to the Joneses’ house after the fire out of fear that litigation may arise because of Alfa’s denial of the Joneses’ claim following Hurricane Opal, its cancellation of the Joneses’ policy, and the fire damage to the Joneses’ house.
The following facts taken as a whole create a jury question. After Hurricane Opal, Alfa never investigated any records it had of the condition of the Joneses’ house before the hurricane. The record reflects that Alfa never contacted a realtor who visited the Joneses’ house three days before Hurricane Opal made landfall, even though, according to Harold Jones, Bradshaw had inquired about purchasing the Joneses’ residence. Alfa never inquired of the Joneses as to who would have seen their house before Hurricane Opal and never attempted to interview anyone who may have visited the Joneses’ house before Hurricane Opal. Alfa never considered its *37 own “rewrite” inspection of the Joneses’ house, including photographs of the exteri- or of the house and never inquired of Sanders, its own employee, as to the condition of the Joneses’ house when he conducted the “rewrite” inspection, even though Sanders testified that he did not recall seeing any cracks in the interior or exterior walls of the Joneses’ house when he conducted the “rewrite” inspection three months before Hurricane Opal.[3]
As this Court observed in Slade, “an insurance company has a ‘responsibility to marshal all ... facts’ necessary to make a determination as to coverage ‘before its refusal to pay.’ ... This duty must include a duty to investigate a covered event that an insured claims has caused his loss.” 747 So.2d at 316. Considering the evidence contained in the record that is before this Court, there is certainly a question of fact as to whether Alfa met its duty to marshal all facts necessary to make a determination as to coverage before it denied the Joneses’ claim. Thus, the trial court erred in granting Alfa’s motion for a summary judgment as to the Joneses’ claims of “abnormal” bad-faith failure to properly investigate the Joneses’ insurance claim and failure to investigate the condition of the house before Hurricane Opal. We therefore reverse the summary judgment entered by the trial court in favor of Alfa on the “abnormal” bad-faith claim.

IV. Conclusion

We conclude that a question of material fact exists as to when the statutory limitations period began to run and prohibits the trial court from entering a partial summary judgment on the Joneses’ bad-faith claims based on Alfa’s argument that the Joneses failed to file their action before the expiration of the statutory limitations period. Thus, the Joneses’ bad-faith claims were not barred by the statute of limitations. Because Alfa failed to properly investigate the Joneses’ claim and failed to properly investigate the condition of the Joneses’ house before Hurricane Opal, the trial court erred in entering partial summary judgment in favor of Alfa as to the “abnormal” bad-faith claim brought by the Joneses. However, the trial court’s summary judgment was proper as to the Joneses’ “normal” bad-faith claim. The summary judgment is affirmed in part and reversed in part, and this case is remanded for proceedings consistent with this opinion.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
LYONS, WOODALL, and PARKER, JJ., concur.
SEE, SMITH, and MURDOCK, JJ., concur in part and concur in the result.
STUART and BOLIN, JJ., concur in the result.

. According to Harold Jones, "At that time Bruce [McLean] was, I guess, advising or helping me with [the claims process] to make sure that I wasn't — that I didn't sign off on anything, you know, that would leave Alfa .... ” Harold also stated:
"As far as engaging, he was, I guess — he did not receive a retainer but he was — I guess his doors was [sic] open at any time that I needed to ask a question or needed some advice. And, of course this was something I needed advice and needed questions answered and I took it to him. But now as far as engaging him or hiring him as an attorney there had not been any such thing as far as saying I want to hire you to represent me in this matter.”

. The Joneses continued to live in the basement of the fire-damaged house.

. Alfa argues to this Court that “Sanders was simply without the training to know these problems existed” when he conducted the "rewrite” inspection. (Alfa’s brief, p. 53.) This argument disregards the question of fact that an untrained eye can observe cracks in drywall and in brick veneer that were evident to the Joneses.